K & R, INCORPORATED, APPELLANT, V. CRETE STORAGE CORPORATION, A CORPORATION, APPELLEE.

231 N. W. 2d 110

Filed June 19, 1975.  No. 39765.

Bernard J. Ach of Ach & Ach, for appellant.

Peterson, Bowman, Coffman & Larsen, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, Mc-COWN, NEWTON, CLINTON, and BRODKEY, JJ.

BRODKEY, J.

K & R, Incorporated, the plaintiff below, appeals to this court from a verdict of a jury in its favor in the amount of $9,179.40 against Crete Storage Corporation, defendant, representing damages to certain french fried potato products manufactured by plaintiff and stored in defendant's cold storage warehouse. In its first cause of action plaintiff had sued for the sum of $17,362.20 together with interest thereon at 6 percent per annum from June 2, 1965, which damage, it claimed, was the result of the negligence of the defendant in maintaining and repairing its refrigeration equipment, as a result of which ammonia fumes escaped from the refrigeration pipes causing the french fried potatoes stored in defendant's warehouse to become damaged and not to be edible or saleable. In its second cause of action, plaintiff also alleged loss of future business profits and prayed for damages in the amount of $200,000, interest, and costs, which it claims resulted from two of the largest customers of K & R finding new suppliers for their french fried potatoes. The District Judge dismissed plaintiff's second cause of action based upon loss of busi-

ness profits before submitting the case to the jury for damages to the potatoes themselves. Defendant's cross-petition for storage charges was not submitted to the jury, having been withdrawn with consent of the defendant. The jury thereafter returned a verdict in favor of the plaintiff in the sum of $9,179.40. The assessment of prejudgment interest was thereafter denied by the trial court, and motions of both parties for new trial were overruled. Plaintiff has appealed to this court. We affirm.

In this appeal, plaintiff alleges three principal assignments of error which it asserts require this court to reverse and remand the cause to the District Court for a new trial. Summarizing, these are: (1) Inadequacy of the verdict; (2) failure to submit the issue of loss of business profits to the jury; and (3) failure to assess interest on the verdict from June 2, 1965, at the rate of 6 percent per annum, until paid. No issue was raised in this appeal as to the sufficiency of the evidence to establish the negligence and liability of the defendant for the damage to the potatoes.

It appears that George Rullman and his wife were the stockholders, officers, and owners of K & R, Incorporated, of Hastings, Nebraska; and had themselves been operating a cold storage facility in that city until about 1961, when they commenced making french fried potatoes, and were approved by the U.S.D.A. for meat and food processing. The record reveals that on December 4, 1964, K & R shipped to and stored with Crete Storage Corporation 996 cases of french fried potatoes, having a net weight of 29,880 pounds, being designated as Lot No. 1204. On December 7, 1964, plaintiff shipped to defendant and stored in defendant's warehouse, 1,050 cases of french fried potatoes with a net weight of 31,500 pounds, designated as Lot No. 1207. Also, on December 17, 1964, it shipped to the defendant 1,000 cases of such potatoes with a net weight of 30,000 pounds, designated as Lot No. 1217. The french fried potatoes were packed 5

pounds to a bag and 6 bags to the box, making a total weight of 30 pounds per box. It is these three shipments of potatoes, totaling 91,380 pounds, which were in storage in defendant's cold storage warehouse at the time of the ammonia leak, June 2, 1965, and which are the subject of the dispute between the parties in this case.

On July 22, 1965, part of Lots Nos. 1204, 1207, or 1217 of the french fries stored at the Crete storage facility were shipped to Fairmont Foods in Lincoln, and were found to be grey colored, limp, and with an odor of ammonia. Rullman later saw french fries from the same lots at King Food Hosts in Lincoln, Nebraska, and found that they were in a similar condition. Rullman contacted the Crete storage warehouse on July 28th or 29th and was told that there had been an ammonia leak, which was subsequently repaired. It was necessary to withdraw all the french fries from the aforementioned customers, and the concerns involved thereafter made arrangements with other suppliers to obtain their french fried potatoes.

Rullman testified that the market prices in 1965 for sale of french fries varied from 19 cents to 19.9 cents per pound, and that in July of 1965 the market price of the french fries was 19 cents a pound for the grade of potato involved herein. He also testified that the potatoes had no value whatsoever after their exposure to the ammonia fumes. He also testified that the average cost of production of french fried potatoes of Grade A type in 1965 was 11½ cents per pound, and after adding overhead, selling, and administration costs, and storage and handling charges, he arrived at a cost of goods sold per pound of 12½ cents, which resulted in an average profit on June 2, 1965, of 6½ cents per pound. However, there were no records of the company introduced in evidence to substantiate these figures. The actual sales to Fairmont Foods of french fried potatoes between January 1, 1965, and June 1, 1965, was approximately 80,050 pounds, the total dollar sales being $15,274.25.

The actual sales to King Food Hosts from January 1 to June 1, 1965, was approximately 297,920 pounds, the total dollar sales being $56,605.50. Historically the gross sales to both companies had increased between the years 1962 and 1964.

We now consider the assignments of error as set out in plaintiff's brief. Plaintiff first claims that the verdict of the jury for damages to the potatoes in the amount of $9,179.40 was grossly inadequate. It is plaintiff's contention that it should have been awarded damages of $17,362.20 with interest thereon from June 2, 1965, at 6 percent per annum, based upon a total loss of 91,380 pounds of french fries of the fair and reasonable value of 19 cents a pound. Assuming the truth of the underlying facts which formed the basis of its claim, the damages would mathematically compute out to that figure. However, many of the underlying assumptions for plaintiff's larger claim are subject to scrutiny. Even assuming, arguendo, that the market price of french fried potatoes of that quality at the time in question was approximately 19 cents per pound, we seriously doubt the validity of plaintiff's assumption that the remaining potatoes in storage at the warehouse had no value. The evidence is undisputed that the potatoes were later sold as salvage, and that the price recovered was from 4½ cents to 6 cents per pound. In addition, there is conflicting evidence in the record as to whether, in fact, all the remaining potatoes in storage were spoiled. There is credible evidence in the record that many of the potatoes were not spoiled, although a complete inspection of all the remaining boxes in storage was not made. There is also evidence in the record that only about one-third of the boxes of potatoes remaining in storage were of the long type selling at approximately 19 cents per pound, which was the type purchased and preferred by the restaurant trade, and that about two-thirds of those remaining were of the type known as "shorts," which were less desirable and presumably sold for a lower

figure. The jury had all this evidence before it in determining the amount of damages to which plaintiff was entitled on its first cause of action, and we are not inclined to disturb its findings. A verdict will not be set aside as inadequate unless it is so clearly against the weight and reasonableness of the evidence and is so disproportionate to the injury proved as to indicate that it was the result of passion, prejudice, mistake, or some other means not apparent in the record, or that the jury disregarded the evidence or rules of law. Cover v. Platte Valley Public Power & Irr. Dist., 173 Neb. 751, 115 N. W. 2d 133 (1962). Even if the evidence on the question of damages had not been contradictory in several material respects, the jury would not have been obliged to believe the testimony of plaintiff's witnesses. We have frequently held that a jury is not required to accept as absolute verity every statement of a witness not contradicted by direct evidence. Batterman v. Richardson, 189 Neb. 303, 202 N. W. 2d 613 (1972); Satterfield v. Watland, 180 Neb. 386, 143 N. W. 2d 124 (1966); Siefford v. Housing Authority, 192 Neb. 643, 223 N. W. 2d 816 (1974). We conclude that the verdict in this case was not improper, and was supported by the evidence.

Further we conclude that the District Court did not err in refusing to award to plaintiff, and to include in plaintiff's judgment, interest at the rate of 6 percent per annum from and after June 2, 1965. It is clear that on that date plaintiff's claim against defendant for damage to the potatoes was an unliquidated claim. The claim was not fixed nor readily determinable, and the conflict of testimony brought out during the course of the litigation clearly indicates this fact, as does also the amount of the verdict. In Mid States Engineering v. Rohde, 182 Neb. 590, 156 N. W. 2d 149 (1968), we stated: " 'The general rule is that, in the absence of agreement to the contrary, liquidated demands bear interest whereas unliquidated demands do not; * * *.' 47 C. J. S., Interest, § 19 a, p. 28. It is true that this court has held upon

occasion that where a reasonable controversy exists as to plaintiff's right to recover and the amount of such recovery, a claim is generally considered to be unliquidated and interest is not allowed. See Lundt v. Parsons Constr. Co., 181 Neb. 609, 150 N. W. 2d 108." See, also, Schmidt v. Knox, 191 Neb. 302, 215 N. W. 2d 77 (1974). In this case the court properly allowed no prejudgment interest.

We turn now to a consideration of plaintiff's principal assignment of error that the trial court should have submitted to the jury the issue of plaintiff's alleged loss of future business profits. Plaintiff asserts that it was entitled to recover such profits because of the fact that Fairmont Foods and King Food Hosts ceased purchasing french fried potatoes from it shortly after the incident in question, or, to be more exact, some time during July 1965. There is, however, a conflict in the evidence as to whether the cessation of business was due to the spoilage of the potatoes during the incidents involved. There is evidence in the record that plaintiff stopped making french fried potatoes early in the year 1966, for reasons which do not appear therein; and, therefore, plaintiff's claim in this regard must, of necessity, be limited to the period of approximately 6 months following July 1965.

The general rule is that prospective profits from an established business, prevented or interrupted by the tortious conduct of the defendant, are recoverable when it is proved (1) that it is reasonably certain such profits would have been realized except for the tort, and (2) that the lost profits can be ascertained and measured, from evidence introduced, with reasonable certainty. 22 Am. Jur. 2d, Damages, § 177, p. 252. Such lost profits must not be speculative, remote, or imaginary, but must be established with reasonable certainty by the evidence. 22 Am. Jur. 2d, Damages, § 178, p. 253; NJI No. 4.50. In Kaufman v. Tripple, 180 Neb. 593, 144 N. W. 2d 201 (1966), this court stated: "The law generally is un-

favorable to the recovery of losses of profits in tort actions. But a recovery of profits does not rest on the fact that they are profits but because they are ordinarily speculative, contingent, or uncertain." In numerous cases this court has held that damages in the nature of anticipated profits on conjectured, expected, or hoped for sales cannot be recovered. Such damages are too speculative, remote, and consequential; they lack the element of certainty necessary to authorize a recovery therefor. Silurian Mineral Springs Co. v. Kuhn & Co., 65 Neb. 646, 91 N. W. 508 (1902); Punteney-Mitchell Manufacturing Co. v. T. G. Northwall Co., 70 Neb. 688, 97 N. W. 1040 (1904).

Mr. Rullman was himself a certified public accountant and testified orally as to the cost accounting system used by K & R in computing the cost of production of the french fried potatoes manufactured by it, and its profit per pound on the sale of the potatoes to its customers. He testified that the same type of system was maintained and used from the time it commenced processing potatoes until it ceased operations. There is evidence in the record that the company stopped making french fried potatoes early in 1966. He also testified as to the volume of sales made by K & R to its two principal customers, Fairmont Foods and King Food Hosts. However his testimony on these matters appears to have been completely oral and no business or cost accounting records were offered or received in evidence at the trial. There is also evidence that the company itself was losing money from its inception and had only begun to show a small profit when the incident involved in this case occurred. He also testified that his income tax return for the year 1965 did not show a profit but explained that away on the basis that the company had a tax loss carryover from the prior years which wiped out the small profit he made in that year. In any event, K & R ceased manufacturing french fried potatoes about 7

months after the occurrence involved in this case, which, by agreement of the parties, was on June 2, 1965.

Plaintiff endeavors to compute its loss of business profits separately as to Fairmont Foods and King Food Hosts, by the expedient of taking its gross sales for the 5-month period from January 1 to June 1, 1965, and dividing that figure by five in order to obtain average monthly sales. That figure, in turn, it divides by 19 cents per pound, which it asserts was the average selling price during that period, in order to obtain the number of pounds sold monthly, and then it multiplies the resulting figure by 6½ cents per pound, which it claims was its average profit per pound according to its cost accounting records, which, however, were not introduced in evidence. The monthly profit thus obtained is then multiplied by 12 in order to obtain the amount of the lost profits on an annual basis.

However, even assuming that the two customers in question would have continued to purchase the same quantities of french fried potatoes from the plaintiff that they had in the prior 6 months, and that the cause of their changing suppliers was, in fact, the bad experience on the occasions in question with plaintiff's potatoes, the fact still remains that the figures presented by plaintiff to substantiate its claim of lost profits are indeed speculative and conjectural. There is evidence in the record that both the market price of the potatoes and the cost of production fluctuated from time to time, and even Rullman testified that he could not state positively what the profits would have been on the volume of sales to which he had testified. He *assumed* that it would be at least as much as it had been. There is also no evidence in the record that plaintiff had the capacity to produce more frozen french fried potatoes than it was currently selling in the market place. Moreover, the use by plaintiff of the figure of 6½ cents per pound as an average profit on sales is open to question, particularly in view of the fact that he introduced no

business records to substantiate the figures to which he testified. The question is not, as we see it, whether his testimony relative to such profits is properly in the record, there being no objections thereto voiced during the trial, but rather whether or not because of the absence of such records plaintiff has proved his loss of profits with "reasonable certainty."

In discussing the effect of the absence of books and records of a company to prove loss of profits as damages, the Supreme Court of Colorado in Lee v. Durango Music, 144 Colo. 270, 355 P. 2d 1083 (1960), quoted from the case of Morrow v. Missouri Pacific Ry. Co., 140 Mo. App. 200, 123 S. W. 1034 (1909), as follows: " 'Such books would contain record entries of the business, an itemized account of the amount of the gross receipts, and the amount of expenditures and the capital invested. Yet in this case no such books were produced in evidence, but the evidence of profits rests wholly upon a statement of a lump sum by one of the plaintiffs in the case.' " In its opinion in the Morrow case, the court further stated: "These books, as usually kept, would contain entries such as no memory could actually preserve, and would show the very essential facts upon which the plaintiffs could recover, if at all, for the loss of profits in their business. And yet no books were produced, and no explanation was given showing that they were lost or not within the possession of the plaintiffs, but reliance was had, as a substitute, upon the memory of one of the interested parties. * * * Besides this, there is an entire failure of the evidence to show in any way what were the total returns of the plaintiffs' business, the amount of the operating expenses, and the depreciation of capital, if any, during the previous fixed period of time. Without such a showing, under the authorities cited, there were no actual facts or reliable data given in evidence that would enable the jury to form a reasonable estimate of the amount of plaintiffs' profits." In Rambo v. Galley, 188 Neb. 692, 199 N. W. 2d 14 (1972), this court made a

similar observation stating: "We assume it to be plaintiff's contention that she would have had a much greater increase in gross income and a profit in 1969, except for the fact that defendants started a competing agency. There is no way, from the evidence, to tell what this increase might have been. *Plaintiff did not put her records in evidence.*" (Emphasis supplied.) Likewise, in Bitler v. Terri Lee, Inc., 163 Neb. 833, 81 N. W. 2d 318 (1957), the court stated: "His testimony, insofar as it was intended to establish costs of production, margin of gross profit, and percentage of gross profit, is unsupported by any record, data, or corroboration. * * * The determination of the cost of production of manufactured goods, the gross margin, and the percentage of gross profit of the organization concerned would generally and logically be expected to be done from the books in which were recorded the facts of its day-to-day transactions and activities and according to usual and ordinary accounting practices. * * * The law requires the best evidence available. A claimant of substantial damages must, to prevail, furnish appropriate data to enable the trier of fact to find the amount of damages with reasonable certainty and exactness if the evidence of damages or the amount thereof are susceptible of definite proof. They may not be established by conjecture, speculation, or doubtful proof. * * * The record of the financial operations of appellant was available in its books." Also, in Gilmartin v. Stevens Inv. Co., 43 Wash. 2d 289, 261 P. 2d 73 (1953), the Supreme Court of Washington specifically ruled that where a plaintiff, in attempting to prove loss of profits, fails to produce available records relevant to such question, plaintiff does not fulfill his obligation of proving damages with "reasonable certainty."

We affirm the judgment of the trial court.

AFFIRMED.