MIKE PRATT & SONS, INC., A CORPORATION, ET AL., APPELLANTS, V. METALCRAFT, INC., A CORPORATION, ET AL., APPELLEES.

383 N.W.2d 758

Filed March 28, 1986.   No. 84-914.

Thomas J. Guilfoyle of Thomas J. Guilfoyle, P.C., for appellants.

Philip J. Lee of Schumacher & Gilroy, for appellees Metalcraft, Inc., and Ruiz.

Dennis J. Mullin of Breeling, Welling, Place & Steier, for appellees Barr, Henneman, and AMRIC International Corporation.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

KRIVOSHA, C.J.

The appellants, Mike Pratt & Sons, Inc., and Pratt Protection Systems, Export, Inc. (jointly hereinafter referred to as Pratt), appeal from a judgment entered in the district court for Douglas County, Nebraska, in favor of the appellees, Metalcraft, Inc., AMRIC International Corporation, Joseph R. Ruiz, Robert Barr, Duane Henneman, and Richard Holm. Pratt's suit sought to recover money damages from the various appellees for allegedly conspiring to tortiously interfere with a business or contract right and for further violating the provisions of the Nebraska antitrust statutes, Neb. Rev. Stat. §§ 59-801 et seq. (Reissue 1984). Pratt has assigned four specific errors allegedly committed by the district court. All of them, however, may be grouped together into one, the essence being that the district court's decision is wrong as a matter of law. We have reviewed the record and conclude that the decision of the district court was not in error as a matter of law and that the judgment dismissing the action should be affirmed.

In proceeding to review this matter, we are required to keep in mind that the findings of a court in a law action in which a jury has been waived have the effect of a jury verdict and will not be

disturbed on appeal unless clearly wrong. In such a circumstance it is not within this court's province to resolve conflicts in the evidence or to weigh the evidence; if there is a conflict in the evidence, this court will review the evidence rendered and will presume that controverted facts were decided in favor of the successful party. See *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 340 N.W.2d 369 (1983). See, also, *Schmode's, Inc. v. Wilkinson*, 219 Neb. 209, 361 N.W.2d 557 (1985); *H & L Equip. v. Schardt*, 217 Neb. 653, 349 N.W.2d 924 (1984). Unless we are able to say as a matter of law that there is no evidence to support the district court's decision, we are compelled to affirm.

The record discloses that in 1980 and 1981, Pratt was engaged in the sale of a number of products and services, including a hand-held portable fire extinguisher. The products were sold both directly by Pratt and through "independent dealers." It eventually became known to Pratt that the extinguisher sold by Pratt used what was thought to be a toxic substance as an extinguishing agent and that, therefore, Pratt needed to find another product to sell. At this time Pratt employed 8 or 10 persons.

Through personnel at Du Pont chemical company, Pratt learned that the appellee Metalcraft, Inc., manufactured a hand-held portable fire extinguisher which used the chemical Halon 1301. Halon 1301 was apparently a safe and effective fire extinguishing agent. At this time the extinguisher manufactured by Metalcraft was sold to the military pursuant to military specifications but had not as yet been approved for other uses by Factory Mutual, an independent testing laboratory, whose approval would be a prerequisite to the sale of this extinguisher in most states.

Michael Pratt contacted the president of Metalcraft, Joseph Ruiz, and persuaded Ruiz to let Pratt market Metalcraft's products. After Ruiz flew to Omaha and met with Michael Pratt and his employees, Pratt and Ruiz verbally agreed to an arrangement whereby Pratt would be a distributor of all Metalcraft products in certain areas. In connection with the marketing of Metalcraft's existing products, Metalcraft also agreed it would allow Pratt to sell a hand-held portable fire

extinguisher using Halon 1301 once the product had been approved by Factory Mutual. Everyone recognized, however, that at the time the agreement was entered into, the product had not yet been approved by Factory Mutual.

On February 3, 1981, Ruiz sent to Pratt a letter appointing Pratt as the exclusive distributor of Metalcraft products, including the military-approved version of the Halon 1301 hand-held portable extinguisher. In addition, a new version that was hoped to be Factory Mutual approved was made a part of the agreement. The letter granted Pratt an exclusive right for a term of 6 months following the obtaining by Metalcraft of the Factory Mutual approval. Additionally, Pratt was given the option to renew the agreement for another 6 months. The February 3, 1981, agreement was supplemented by an additional letter dated March 17, 1981, which granted Pratt the right to market a fire extinguisher identified as the SEA-FIRE unit, and other larger systems as they were developed.

After receipt of the two letters Pratt attempted to develop an organization and market the products. The record discloses that after March 1981 Pratt virtually discontinued the sale of all of its other items and focused its entire energy and attention on the sale and development of the Halon 1301.

During 1981, however, Pratt experienced severe difficulties in selling the military version of the Halon 1301. In some areas the military version extinguisher could not be sold because it was not Factory Mutual approved. In other areas, such as Omaha, Nebraska, the military version could be sold but only as an ancillary fire system and not for the purpose of meeting code requirements. Because of the expenditure of time and money on the promotion of a product which was then unavailable and the difficulties in selling an unapproved product, Pratt was beginning to experience cash-flow problems by the end of 1981. This was partially true because Pratt had phased out most of its other products in order to put all of its efforts toward selling the expected Factory Mutual-approved Halon 1301 hand unit.

Toward the end of 1981, in order to alleviate some of the financial problems, Pratt started a photocard business. Pratt continued the promotion and development of the Halon 1301

hand-held portable fire extinguisher, but with diminished effort, and began making arrangements to resume direct sales of fire alarms, which was the business Pratt had been in prior to getting into the sale of fire extinguishers. By April 1, 1982, because all or most of the employees of Pratt were paid on a commission basis and the company had all but stopped making money, there was a mass exodus by the employees, and the only remaining employees of Pratt on April 1, 1982, were its president, Michael Pratt, and his wife, Rita.

The evidence of subsequent events is in conflict. Nevertheless, the record would permit the trial court to reach the conclusions it reached. Those conclusions would establish that sometime in the early or middle part of April 1982, Metalcraft verbally terminated its agreement with Pratt, although the relationship was not terminated in writing until May 24, 1982. Ruiz gave three reasons for the termination.

The first incident apparently occurred sometime prior to October of 1981. Pratt had called Ruiz, claiming to have a large order overseas. As a result of this assurance by Pratt, Metalcraft increased its stocking levels. However, the order never materialized and Metalcraft was forced to keep the extra stock. The second incident happened sometime in February of 1982. Apparently, Pratt sold some non-Factory Mutual-approved fire extinguishers to a person representing a company in California. Upon investigation by the California fire marshal, the California corporation was not permitted to sell the extinguishers. Pratt was asked to take back the extinguishers but refused to do so. The California salesman and the state fire marshal both then contacted Ruiz, who informed Pratt of his displeasure at this turn of events. Pratt eventually took the product back. This situation led to a telephone call between Michael Pratt and Ruiz, from which Pratt concluded and related to the appellee Robert Barr, who was then employed by Pratt, that it looked like Pratt would not be a Metalcraft distributor any longer. This conversation occurred in March of 1982. Thirdly, Pratt, being unable to pay for products that it had purchased from Metalcraft, arranged with Ruiz to return products and demonstration units to satisfy Pratt's indebtedness. In a phone conversation sometime before April

26, 1982, regarding the return of the products, Ruiz felt he was led to believe that Pratt's purpose in returning the products, including sales tools, was to arrange the termination of the distributorship and the winding up of the relationship and to liquidate Pratt's indebtedness to Metalcraft. Ruiz testified that he told Michael Pratt that if Pratt returned the goods, he, Ruiz, would consider their relationship at an end. Ruiz concluded that Pratt was no longer interested in being a distributor of Metalcraft products and was, he felt, terminating the arrangement. While Pratt maintains such was not the case, there was sufficient evidence to support Ruiz' position, and the district court's finding to that effect is not clearly wrong.

On or about April 26 or 27, 1982, Ruiz called Barr at home, and Barr informed Ruiz that Barr no longer worked for Pratt, having terminated his relationship prior to April 1, 1982. Ruiz had placed the call to Barr after attempting to contact Pratt, without success. He testified that he contacted Barr to discover what was wrong. In that same conversation Ruiz informed Barr that the relationship between Pratt and Metalcraft was over.

On April 30, 1982, Pratt wrote a letter to Ruiz and returned the products for credit. This letter was included with the products and came to Ruiz' attention eventually. Although Pratt concluded the letter with a request to be informed when the long-awaited Factory Mutual approval had been obtained, Ruiz still felt that based upon the return of the products and the sales aids, the business relationship was at an end. To leave no doubt, however, Ruiz sent a letter to Pratt dated May 24, 1982, stating that the Pratt-Metalcraft relationship was terminated.

During this time, Barr and another former Pratt employee, Duane Henneman, having left Pratt's employment prior to April 1, 1982, considered setting up a distributorship company for a variety of products, and, in May of 1982, they organized a corporation known as AMRIC.

The record further discloses that on May 1, 1982, Barr telephoned Ruiz to ascertain the status of the Metalcraft distributorship. He asked Ruiz pointblank whether Pratt was still Metalcraft's distributor. Ruiz assured him that Pratt was no longer representing Metalcraft and verbally committed to Barr that AMRIC could have distributorship rights in Metalcraft.

The record further discloses that sometime in the early part of April 1982, a James Klosner, who had been a manufacturer's representative in the health care industry for about 20 years, was approached in an Omaha bar by a Mike Niemann. There is no indication from the record that, at any time prior to contacting Klosner, Niemann had had any conversations with Barr, Henneman, or any other representative of AMRIC. Niemann suggested to Klosner that he, Klosner, could become involved in the distribution of a new product being manufactured by Du Pont and Metalcraft. Subsequently, Klosner told Niemann he was interested in this new product, and on or around May 1, 1982, Niemann, apparently for the first time, contacted Barr and arranged a meeting at his home between Klosner, Barr, and Henneman. On May 7, 1982, Barr went to Niemann's home, where Klosner was present, and a subdistributorship agreement was executed between AMRIC and Klosner regarding the subdistribution of the Metalcraft Halon 1301 extinguisher. At that meeting there were brochures and advertising pamphlets which had been supplied by Niemann. Niemann did not testify, and the evidence does not reveal how Niemann came into possession of these promotional materials. Pratt argues that undoubtedly Barr or Henneman must have been in contact with Metalcraft prior to May 1, 1982, and that therefore there is conclusive evidence of their conspiracy to interfere with the contract between Metalcraft and Pratt. We may dispose of that argument, however, by simply saying that there is no evidence to support that claim, and there is no basis upon which, on review, we can say that the district court was in error in not reaching the conclusions urged by Pratt in that regard.

We believe, further, that the district court's finding that an agreement between AMRIC and Metalcraft was reached on or about April 1, 1982, must simply have been a clerical error, as it is not supported at all by the record. We find that the only credible evidence in the record relating to the date of any initial agreement between AMRIC and Metalcraft shows that it was entered into on or about May 1, 1982.

A written agreement was finally executed between Metalcraft and AMRIC on October 1, 1982. Near the end of

1982 or the beginning of 1983, a hand-held portable Halon 1301 extinguisher manufactured by Metalcraft received Factory Mutual approval and was at last available for distribution and sale; however, for reasons not relevant to this action, AMRIC's contract with Metalcraft for the distribution of the Factory Mutual-approved, hand-held portable extinguisher was terminated without performance by AMRIC.

We first direct our attention to the claim of Pratt that Metalcraft and the other appellees engaged in a civil conspiracy to tortiously interfere with Pratt's contract. The elements of a civil conspiracy are set out in the case of *Diesel Service, Inc. v. Accessory Sales, Inc.*, 210 Neb. 797, 803-04, 317 N.W.2d 719, 723 (1982), wherein we said:

> Where two or more persons combine to unlawfully injure another's business, the action is properly one for conspiracy.
>
> " '. . . The principle [sic] element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury. Without the scienter persons cannot conspire.' " *Dixon v. Reconciliation, Inc., supra* at 47, 291 N.W.2d at 232. . . .
>
> " 'To constitute a conspiracy there must be a combination of two or more persons; * * * a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.' "

And in order for there to exist a cause of action for tortious interference with a business relationship, it is necessary to prove:

> (1) The existence of a valid business relationship or expectancy; (2) Knowledge by the interferer of the relationship or expectancy; (3) An intentional act of interference on the part of the interferer; (4) Proof that the interference caused the harm sustained; and (5) Damage to the party whose relationship or expectancy was disrupted.

*Miller Chemical Co., Inc. v. Tams*, 211 Neb. 837, 841, 320 N.W.2d 759, 762 (1982).

In the instant case the district court found that Pratt had "failed to prove by a preponderance of evidence that a conspiracy existed between the defendants to injure the plaintiff by taking his distributorship rights from him through any preconceived plan or unity of design and purpose arrived at among the defendants" and that Pratt had "failed to prove by a preponderance of the evidence that the defendants intentionally interfered with plaintiff's distributorship rights with the defendant Metalcraft, Inc." It is not possible for us to say that such findings were clearly wrong. There was no direct evidence offered by Pratt to show a preconceived plan. The most that Pratt offered was its own speculation and conjecture. Pratt argues that if one looks at the evidence, it is obvious that a conspiracy must have been brewing even before Barr and Henneman left Pratt. While one may make the argument, it cannot be said that the district court's refusal to accept the argument was wrong. In addition, there was certainly more than enough evidence to establish that AMRIC and Metalcraft did not begin negotiations on a distributorship contract until after both sides truly believed that the Pratt-Metalcraft relationship was at an end. Barr testified that he had received assurances from Ruiz before the meeting with Klosner that the Metalcraft distributorship was "up for grabs." Further, Ruiz testified that he believed that when Pratt returned the Metalcraft products at the end of April, Pratt was through dealing with Metalcraft. One cannot say that such a belief on Ruiz' part was unreasonable or could not be believed. In brief, there was credible evidence for the district court to conclude that none of the defendants intentionally conspired to interfere with, or intentionally interfered with, the Metalcraft contract with Pratt.

The district court also found that there was sufficient evidence to justify Metalcraft's terminating its relationship with Pratt. We cannot say that that finding was in error. Once we determine, as we do, that the district court was not in error in determining that there was no conspiracy and that Metalcraft properly terminated the arrangement with Pratt, Pratt's claim that there was a violation of the Nebraska restraint of trade act also falls.

As to Metalcraft, we have concluded that it was justified in terminating its relationship with Pratt. We have held that such a justifiable termination does not operate to create a liability, either under a contract theory or under the state antitrust statutes, against one who terminates a contract. See *Hompes v. Goodrich Co.*, 137 Neb. 84, 288 N.W. 367 (1939). Regarding AMRIC, if we accept, as we must, the district court's finding that AMRIC first became involved in negotiations with Metalcraft after Pratt had but only two employees, was in severe financial difficulty, and had abandoned further efforts to sell the Metalcraft product, we see no evidence that AMRIC attempted in any way to drive Pratt out of business. See *Pierce Co. v. Century Indemnity Co.*, 136 Neb. 78, 285 N.W. 91 (1939). We, therefore, are unable to say that the district court was in error in failing to find that any of the appellees violated the Nebraska restraint of trade act.

Reviewing the record, as we must in a law action, we find that the decision of the district court was not in error, and the judgment is affirmed.

AFFIRMED.