912 F.2d 234
 TRIPLE R INDUSTRIES, INC., a Nebraska Corporation, Appellant,
v.
CENTURY LUBRICATING OILS, INC., A Delaware Corporation, Appellee.
TRIPLE R INDUSTRIES, INC., a Nebraska Corporation, Appellee,
v.
CENTURY LUBRICATING OILS, INC., A Delaware Corporation, Appellant.
 Nos. 89-2250, 89-2335.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 12, 1990.
Decided Aug. 21, 1990.
 
 Richard M. Black, Omaha, Neb., for appellant.
 Daniel J. Duffy, Omaha, Neb., for appellee.
 Before BEAM, Circuit Judge, HEANEY, Senior Circuit Judge, and LARSON,* Senior District Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Triple R Industries, Inc. brought suit against Century Lubricating Oils, Inc.,[1] alleging that Century, Triple R's supplier, had tortiously interfered with Triple R's business relationship with Union Pacific Railroad. Century counterclaimed for money due on orders placed by Triple R. The district court entered a directed verdict in Century's favor on its counterclaim. The jury found Century liable for tortious interference and awarded Triple R $300,000 in damages.[2] The district court granted judgment notwithstanding the verdict in favor of Century, holding that Triple R had failed to prove that Century engaged in tortious conduct and that Triple R had failed to prove damages with certainty. Triple R appeals from the judgment notwithstanding the verdict. Century cross-appeals from the district court's refusal to grant interest on its counterclaim.[3] We believe that there was sufficient evidence to support a jury finding of liability, and sufficient evidence to support an award of $213,714 in damages to Triple R. We direct that a new trial be held to determine Triple R's damages unless Triple R agrees to a remittitur to $213,714. We also hold that Century was entitled to interest on its counterclaim in the amount fixed by the purchase contracts between the parties.
 
 I.
 
 2
 Judgment notwithstanding the verdict is proper where the evidence is not sufficient to create an issue of fact for the jury. To sustain a district court's grant of judgment notwithstanding the verdict, we must find that all the evidence points one way and is not susceptible of a reasonable interpretation supporting the non-moving party's case. Brown v. Syntex Laboratories, Inc., 755 F.2d 668, 671 (8th Cir.1985).
 
 A.
 
 3
 To prevail on a cause of action for tortious interference with a business relationship, the plaintiff must prove:
 
 
 4
 (1) The existence of a valid business relationship or expectancy; (2) Knowledge by the interferer of the relationship or expectancy; (3) An intentional act of interference on the part of the interferer; (4) Proof that the interference caused the harm sustained; and (5) Damage to the party whose relationship or expectancy was disrupted.
 
 
 5
 Mike Pratt & Sons, Inc. v. Metalcraft, Inc., 222 Neb. 333, 383 N.W.2d 758, 763 (1986). We believe that Triple R introduced sufficient evidence to carry its burden of proof with respect to each element of the tort. The district court's contrary conclusion is based on its erroneous belief that the jury could not find that Century promised not to compete with Triple R for Union Pacific orders. We review the evidence which supports Triple R's claim.
 
 
 6
 Century had tried to sell its lubricants to Union Pacific without success before it entered into an agreement with Triple R. Trial transcript 176-81 (Tr.). Union Pacific was a difficult customer to develop a relationship with. Suppliers had to be on an approved supplier list. Union Pacific took six to ten months to approve lubricants. A salesman had to make "hundreds" of calls to get a particular product approved. Sales were made either by soliciting bids or through direct negotiations with individual suppliers. Tr. at 32.
 
 
 7
 Triple R Industries was operated by Ervin Rogers. Its shareholders were Rogers, Rogers' wife, and his two sons. Triple R was a broker that purchased and resold business products, usually lubricants, in the Omaha area without warehousing the products. One of Triple R's long-term customers was Union Pacific Railway. In 1981, Rogers entered into an agreement to sell Century lubricants. For all practical purposes, Rogers was the sole distributor of Century lubricants in the Omaha area in 1981. Century provided Rogers with technical support and lubricants under Triple R's label for Triple R's customers, including Union Pacific. The agreement between Triple R and Century included account coordination, whereby Rogers had the exclusive right to sell to certain customers, including Union Pacific. Tr. at 26, 28; exhibits 4 and 5 (Ex.). Rogers disclosed to Century Triple R's customer lists and relevant sales information upon Century's reassurance that the sole purpose for requiring this information was to avoid direct competition between it and Triple R. Tr. at 26. Triple R received Union Pacific's approval for Century's lubricant. Ninety percent of Triple R's sales in 1982 and 1983 were made to Union Pacific. Tr. at 31.
 
 
 8
 In 1984, Rogers paid a call on Union Pacific offices and encountered the Century Custom Sales Manager. Tr. at 44, 168. Rogers testified that a Union Pacific employee told him that the Century representative had suggested to Union Pacific that Century deal direct with Union Pacific. Tr. at 46. Rogers testified that thereafter he had to bid for Union Pacific business at lower and lower prices because someone kept undercutting his bid. "I'd bid the next one at the same price, I'd miss it, so somebody else was following the same downward pricing pattern that I was and I didn't know who it was." Tr. at 47. In late 1984, Rogers began bidding at a loss to maintain Union Pacific as a client while he searched for another supplier. Id. Century was bidding directly for Union Pacific orders against Triple R in 1985. Tr. at 114. By January of 1986, Triple R's account at Century became delinquent in the amount of $62,661.36, reduced by subsequent payments to $51,833.59. On January 7, 1986, Triple R was put on credit hold and shipments were frozen. Tr. at 195.[4] Triple R submitted partial payment by check. The check was dishonored, and its account with Century was frozen a second time. A Century employee, Paul Pattavina, testified that he went to work for Precision Bearing to establish a lubrication program on January 1, 1986, in advance of Triple R's credit hold and termination. One-half of Pattavina's salary was paid by Century and one-half was paid by Precision. Tr. at 143. On January 22, Precision was appointed Century's exclusive representative in the Omaha area. Ex. 18-B. Century informed all of its indirect customers that Precision was the new distributor. Because of delays in receiving lubricant, Union Pacific cancelled its order with Triple R on March 14, 1986. Ex. 12. Century resumed supplying lubricant to Union Pacific through other suppliers. Tr. at 183.
 
 
 9
 It took Rogers a year and a half from October 1984 to find another volume supplier, Exxon, interested in distributing lubricants through Triple R. Tr. at 47-48. Rogers began submitting Exxon lubricants for approval to Union Pacific. Century, however, had informed Union Pacific that Triple R had credit problems. Union Pacific then removed Triple R from its approved list. Tr. at 50. Exxon subsequently dropped Triple R. Tr. 50-51. Triple R lost money in 1985 and 1986 and went out of business in 1986. Tr. at 59.
 
 
 10
 We believe this evidence is sufficient to support a finding of liability. The jury could infer that Century entered into a distributorship agreement with Triple R in order to become Union Pacific's indirect supplier. In return, Century promised not to compete with Triple R for Union Pacific orders. Through Rogers' efforts, Century lubricants were approved for purchasing. The jury could conclude that Century broke its promise not to compete, undercut Triple R's price, terminated Triple R's supply, and prevented Triple R from competing with Exxon lubricants. The district court erred by re-weighing this evidence and granting a judgment notwithstanding the verdict.
 
 B.
 
 11
 Under Nebraska law, "prospective profits from an established business, prevented or interrupted by the tortious conduct of the defendant, are recoverable when it is proved (1) that it is reasonably certain such profits would have been realized except for the tort, and (2) that the lost profits can be ascertained and measured, from evidence introduced, with reasonable certainty." K & R, Inc. v. Crete Storage Corp., 194 Neb. 138, 231 N.W.2d 110, 114 (1975); Diesel Service, Inc. v. Accessory Sales, Inc., 210 Neb. 797, 317 N.W.2d 719, 725 (1982). The certainty requirement for the recovery of lost profits balances the defendant's right to avoid liability out of proportion to its culpability against the plaintiff's right to full compensation. Cf. Miller v. Kingsley, 194 Neb. 123, 230 N.W.2d 472, 474 (1975) ("The measure of recovery in all civil cases is compensation for the injury sustained."). "Such lost profits must not be speculative, remote or imaginary...." K & R, 231 N.W.2d at 114. "The law generally is unfavorable to the recovery of losses of profits in tort actions." Id. (citing Kaufman v. Tripple, 180 Neb. 593, 144 N.W.2d 201, 207 (1966)).
 
 
 12
 More recently, the Nebraska Supreme Court has emphasized that "[u]ncertainty as to the fact of whether any damages were sustained at all is fatal to recovery, but uncertainty as to amount is not." El Fredo Pizza, Inc. v. Roto Flex Oven Co., 199 Neb. 697, 261 N.W.2d 358, 364 (1978) (citing Fisher v. Hampton, 44 Cal.App.3d 741, 118 Cal.Rptr. 811 (1975)); see also J'Aire Co. v. Gregory, 24 Cal.3d 799, 157 Cal.Rptr. 407, 411-13, 598 P.2d 60, 64-66 (1979) (increasing tolerance of lost profit claims). In K & R, the plaintiff failed to prove damages where the food commodity involved fluctuated greatly in profitability and where the plaintiff submitted no business records to substantiate his estimates. Id. at 115; see also Suhr v. City of Scribner, 202 Neb. 364, 275 N.W.2d 596, 599 (1979) (no business records). In El Fredo, recovery for the lost profits of a new franchise business were allowed where business records and testimony reasonably established some economic injury. El Fredo, 261 N.W.2d at 364-67 (ordering remittitur). Similarly, the jury verdict was upheld in Diesel Service, Inc. v. Accessory Sales, Inc., 210 Neb. 797, 317 N.W.2d 719, 725 (1982), where past sales records permitted the jury to reasonably estimate lost profits. Thus, under Nebraska law, the key to establishing lost profits is the establishment of a course of business activity through business records. Id.; Suhr, 275 N.W.2d at 599; El Fredo, 261 N.W.2d at 365.
 
 
 13
 There was substantial evidence to support the jury's conclusion that Triple R would have realized continuing profits but for Century's wrongful conduct. Triple R had a longstanding business relationship with Union Pacific. There was no testimony that Union Pacific was dissatisfied with the lubricant or service prior to Century's credit hold. The evidence reflects purchase contracts in force in 1985 and 1986 until an order was cancelled by Union Pacific when Triple R was unable to deliver supplies. Most importantly, there was evidence from which the jury could infer that absent Century's interference with the business relationship between Triple R and Union Pacific, that Triple R's profit margin in fiscal 1983 would have continued through fiscal 1984.
 
 
 14
 Whether Triple R proved its damages with reasonable certainty is a closer question. Rogers estimated that Union Pacific accounted for ninety percent of Triple R's sales in 1982 and 1983. Triple R submitted tax records[5] which are sufficient to prove some damages in light of its theory that Century's wrongful competition caused the total failure of its business thereafter and hindered Triple R's ability to succeed with its mitigation strategy of finding a replacement supplier.[6] These exhibits disclosed gross sales in Triple R's fiscal year 1983 of $1,257,623. The cost of goods sold was $1,101,977, leaving a gross profit of $155,646 and a pre-tax profit of $55,975. In fiscal year 1984, gross sales declined by approximately $200,000 to $1,051,065. The cost of goods sold was $1,033,528, and Triple R incurred a net loss of $157,739. The jury could infer that this loss was caused by Century's interference, which caused Triple R to bid at a loss to retain the business.
 
 
 15
 The merchandise costs in 1983 and 1984 are similar, suggesting similar volume sales for the two years. Triple R's past profits provide the basis for a reasonable estimate of expected profits in fiscal 1984 of $55,975 if Triple R had been able to continue to sell lubricant to Union Pacific without cutting its price. Thus, the loss of an expected pre-tax profit of $55,975, together with an operating loss of $157,739, provides a measure of damages in the sum of $213,714. While the evidence supports the conclusion that there were continuing damages thereafter, the business records provided could not enable the jury to determine with reasonable certainty damages in future years.
 
 
 16
 Because both grounds of the district court's decision are erroneous, we reverse the district court's grant of judgment notwithstanding the verdict. Because the damages awarded are clearly excessive, however, we remand for a new trial on the issue of damages unless Triple R agrees to a remittitur in the amount of $213,714.
 
 II.
 
 17
 Century cross appeals from the district court's failure to award interest on its counterclaim. The counterclaim represents Triple R's unpaid purchases from late 1985 and early 1986. The trial court awarded Century $51,833.59. Both parties agree that interest should be awarded if the amount in dispute was liquidated. See Philip G. Johnson & Co. v. Salmen, 211 Neb. 123, 317 N.W.2d 900, 905 (1982) (claim is unliquidated if there is controversy as to right of recovery and amount).
 
 
 18
 We disagree with the district court's conclusion that the amount of the counterclaim was not liquidated. The amount due was fixed by individual purchase orders. In its amended counterclaim, Century fixed the amount at $51,833.59 plus finance charges.[7] Triple R did not contest this amount, and a directed verdict was granted allowing Century only the principal owed. The district court, however, concluded that the amount was unliquidated, relying on the pre-trial order and a September 1986 letter from Century's counsel requesting payment of $52,578.32. The pre-trial order, however, is insufficient to create a dispute as to whether Triple R owed money to Century since it simply lists the matter as disputed. A mere denial does not create a real controversy, especially where, at trial, Century's claim was uncontested. Nor can the September letter convert the otherwise fixed amounts of the invoices to an unliquidated sum. The $52,578.32 figure likely reflects the finance charges which were beginning to accumulate. The existence of finance charges at a fixed rate does not render a sum unliquidated. Century was entitled to the finance charges agreed upon by the parties. Neb.Rev.Stat. Sec. 45-103 (1988) (interest at statutory rate unless a different rate is agreed upon by the parties). The district court's contrary conclusion would mean that where an interest rate on unpaid sums is fixed by contract, the creditor is not entitled to either pre-judgment interest or the agreed upon interest.
 
 III.
 
 19
 Accordingly, we reverse the judgment of the district court. This case is remanded to the district court for disposition consistent with this opinion. Triple R must file in the district court within fifteen days of the issuance and filing of the mandate in the district court, a consent to a remittitur in the sum of $213,714 or a new trial will be granted by the district court on the issue of damages.
 
 
 20
 BEAM, Circuit Judge, concurring in part and dissenting in part.
 
 
 21
 I concur in the result reached in the cross-appeal by Century. However, I respectfully dissent from the opinion expressed by the majority in the appeal of Triple R.
 
 
 22
 The district court was correct in concluding that Triple R failed to establish tortious interference and failed to adequately prove damages resulting from interference, if any. Since the evidence adduced at trial made the matter of liability at least arguable, I will discuss only the question of damages. On this issue, Triple R fell conspicuously short of the mark.
 
 
 23
 I agree with the majority that the basic rule on damages for prospective profits, the only measure even sought to be established by Triple R, is set forth in K & R, Inc. v. Crete Storage Corp., 194 Neb. 138, 231 N.W.2d 110, 114 (1975):
 
 
 24
 The general rule is that prospective profits from an established business, prevented or interrupted by the tortious conduct of the defendant, are recoverable when it is proved (1) that it is reasonably certain such profits would have been realized except for the tort, and (2) that the lost profits can be ascertained and measured, from evidence introduced, with reasonable certainty. 22 Am.Jur.2d, Damages, Sec. 177, p. 252. Such lost profits must not be speculative, remote, or imaginary, but must be established with reasonable certainty by the evidence. 22 Am.Jur.2d, Damages, Sec. 178, p. 253; NJI No. 4.50. In Kaufman v. Tripple, 180 Neb. 593, 144 N.W.2d 201 (1966), this court stated: "The law generally is unfavorable to the recovery of losses of profits in tort actions. But a recovery of profits does not rest on the fact that they are profits but because they are ordinarily speculative, contingent or uncertain." In numerous cases this court has held that damages in the nature of anticipated profits on conjectured, expected, or hopes for sales cannot be recovered. Such damages are too speculative, remote and consequential; they lack the element of certainty necessary to authorize a recovery therefor.
 
 
 25
 I also agree that El Fredo Pizza, Inc. v. Roto-Flex Oven Co., 199 Neb. 697, 261 N.W.2d 358, 364 (1978) (quoting Fisher v. Hampton, 44 Cal.App.3d 741, 118 Cal.Rptr. 811 (1975)) stands for the proposition that " '[u]ncertainty as to the fact of whether any damages were sustained at all is fatal to recovery, but uncertainty as to the amount is not.' "
 
 
 26
 It is difficult to tell whether the appendix contains a transcript of all of the testimony and copies of all of the exhibits. However, it appears that only the testimony of Ervin R. Rogers, an officer and thirty-five percent shareholder of Triple R, dealt in any substantial way with proof of damages. The only additional evidence on the matter of damages is contained in Exhibits 23A, 23B and 23C, income tax returns for two corporate fiscal years extending from August 1, 1983, through July 31, 1984 (FY 1983); and August 1, 1984, through July 31, 1985 (FY 1984). The 1984 fiscal year return was filed in two parts.
 
 
 27
 The substantive testimony on damages by Rogers, other than that presented as foundation for the tax return exhibits, consisted of a failed attempt to recite hearsay statements purportedly made to Rogers by his CPA. These alleged declarations were, of course, properly excluded from the record by the district court.[8] Therefore, the only good evidence of the existence or amount of damages suffered by Triple R must be gleaned from the tax returns for the two fiscal years.
 
 
 28
 The returns, standing alone, prove nothing. The portions in evidence are confusing and may be incomplete. Further, in FY 1984, the year used to show the purported impact from the alleged tort, two returns were filed because of a change in corporate status for tax reporting purposes. It appears that the corporation changed from a cash basis as a Subchapter S corporation to an accrual basis as a regular corporation. How these returns can be used to establish lost profits extending through calendar or fiscal 1985 and 1986 is baffling.
 
 
 29
 They show a slight decline in gross sales between FY 1983 and FY 1984 and a decrease in the difference between cost of goods sold and the gross receipts from sales. However, without an explanation of the figures, and there was none, they prove little, if anything, of value.
 
 
 30
 The majority admits that proof of damages with reasonable certainty is a close question. It then contends that the above referenced returns, coupled with Triple R's theory that Century caused a "total failure" of its business, are sufficient to preserve for Triple R most of the judgment for damages returned by the jury. Of course, there is no evidence of a total failure in Triple R's business caused by Century's tortious interference with Triple R's relationship with the Union Pacific Railroad. Indeed, the evidence points the other way.
 
 
 31
 Rogers testified that in FY 1983, Triple R's best year, Tr. at 58, Union Pacific accounted for ninety percent of Triple R's sales. Id. at 31. In FY 1984, however, the percentage had dropped according to Rogers to "45 to 50 per cent [sic] because by that time we had gotten other railroads as customers and they were consequently buying an equal volume of product." Id.
 
 
 32
 In FY 1983, Triple R claimed profit from sales to the Union Pacific (purportedly ninety percent of its sales), of $79,000 to $80,000, id. at 75, as compared with a total gross profit for all sales as shown on the FY 1983 tax return of $155,646. Thus, the non-Union Pacific profits in FY 1983 must have been exceedingly good, e.g., ten percent of the sales accounted for $75,646 in gross profits. Then, in FY 1984, when sales to other railroads had increased to forty-five to fifty percent of Triple R's volume, gross profits, according to the tax returns, dropped to $17,537. The only conclusion that can be drawn from this is that the margin of profit on sales had dropped for all railroad business or that expenses, not attributable to the alleged tort, had increased dramatically. In this regard, it is clear from the tax returns that the expenses other than cost of goods sold increased in FY 1984 by at least $75,505.
 
 
 33
 Thus, it seems almost ludicrous for Triple R to contend that it established that its business became a total failure because of tortious interference by Century in Triple R's business relationships with one customer, the Union Pacific Railroad.
 
 
 34
 Further, Kelly Kephart, an accountant employed by Century, testified that in calendar years 1984 and 1985, Triple R purchased a total volume of $100,000 worth of Century products per year. Applying such a volume to the total sales reported by Triple R on the tax returns in evidence, the maximum damages generated by the loss of all of the Century sales, even if totally attributable to the alleged torts of Century, would have been but a few thousand dollars per year. Also, the $200,000 decline in sales in FY 1984 referred to in the majority opinion could not have been attributable to loss in sales of $100,000 worth of Century products, whatever the reason for the decline.
 
 
 35
 In sum, I believe that to permit Triple R to retain the benefit of a judgment in the amount of $213,714 based upon the evidence presented at this trial is a miscarriage of justice. Thus, I would affirm the trial court on the judgment notwithstanding the verdict in favor of Century.
 
 
 
 *
 The Honorable Earl R. Larson, United States Senior District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 Triple R was formerly known as Rogers and Sons and Century Lubricating was formerly called Century Hulbert. We refer to them as Triple R and Century
 
 
 [2]
 Triple R also alleged breach of contract and violation of the Robinson-Patman Act. The district court granted a directed verdict for Century on these claims. Triple R does not appeal from these decisions
 
 
 [3]
 Century also appeals from the trial court's refusal to rule on Century's motion for a new trial. We find no merit in this appeal
 
 
 [4]
 Triple R had been delinquent before. It had always paid for its purchases, however, and never before been put on credit hold. Tr. at 195, 209, 214
 
 
 [5]
 Triple R admitted its tax return from 1983 and two returns from 1984 when it converted to an S corporation. Exhibit 23-A was a return for a partial year, March 1, 1985 through July 31, 1985. Exhibit 23-B is a return for the period August 1, 1984 through February 28, 1985. Exhibit 23-C is a return for August 1, 1983 through July 31, 1984
 
 
 [6]
 The partial transcript does not disclose whether Century argued at trial that Triple R failed to mitigate its damages. Century does not raise this issue on appeal
 
 
 [7]
 Century's initial counterclaim filed with its answer did not specify an amount
 
 
 [8]
 This attempted use of hearsay also causes one to wonder why the CPA was not called as a witness