**AMERICAN ROAD EQUIPMENT COMPANY, Plaintiff–Appellee,**

v.

**EXTRUSIONS, INC., Defendant–Appellant.**

No. 93–2016.

United States Court of Appeals, Eighth Circuit.

Submitted: Dec. 17, 1993.

Decided: July 12, 1994.

---

Norman Denenberg, Omaha, NE, argued, for appellant.

David Buelt, Omaha, NE, argued, for appellee.

Before LOKEN, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

LOKEN, Circuit Judge.

In this diversity action, a jury awarded American Road Equipment Company ("American Road") $273,600 in consequential damages on its claim that Extrusions, Inc. ("Extrusions"), failed to timely deliver components for American Road's gas stove products. Extrusions appeals. We conclude that the evidence does not support a large portion of this lost profits damage award. Accordingly, we remand the case for a new trial unless American Road consents to a remittitur to $94,045.

■ On appeal, Extrusions primarily argues that the award of lost profits was totally unsupported by the evidence at trial.[1] We will reverse a jury verdict awarding lost profits damages "only where the evidence is susceptible to no reasonable inferences sustaining it." *Cashman v. Allied Prods. Corp.*, 761 F.2d 1250, 1253 (8th Cir.1985). We view the evidence in the light most favorable to American Road, the prevailing party. *See, e.g., Cole v. Control Data Corp.*, 947 F.2d 313, 315 (8th Cir.1991).

American Road is a Nebraska manufacturer of heating stoves for home use. In the late 1980s, American Road introduced its first gas stove products. It began selling a fireplace insert called the "Lorraine" in late 1988 and introduced a freestanding unit called the "Cassandra" in the fall of 1989. For these two years, Extrusions was the sole supplier of specially designed trim pieces for the Lorraine and Cassandra products. This lawsuit focuses on the parties' disastrous relationship in 1989.

In May, 1989, an American Road consultant prepared a business plan for the company's lender that projected sales of 550 Lorraines and 1,100 Cassandras in 1989, provided that American Road delivered these products to its distributors no later than early

---

1. In the course of its lengthy argument on lost profits, Extrusions asserts: (i) that Extrusions' order acknowledgments preclude recovery for delayed shipments as a matter of law; (ii) that the district court erred in not instructing the jury that Extrusions had the right to delay shipments if American Road was delinquent; (iii) that there can be no recovery of lost profits for a new product; (iv) that the district court erred in letting the jury consider evidence of rejects in determining lost profits; (v) that the testimony of American Road distributors was too speculative to be admissible; and (vi) that the district court erred in giving its own lost profits instruction rather than Extrusions' requested instruction. We have considered these scattergun assertions as separate arguments and conclude that each is without merit.

November, in time for the seasonal home heating market. Between June 15 and August 1, 1989, American Road submitted to Extrusions four purchase orders requesting shipment of trim pieces for 550 Lorraines and 1100 Cassandras between mid-July and early October. Extrusions accepted these orders.

In late June, American Road's President, John Agee, visited Extrusions' facility in Fort Scott, Kansas. Agee stressed that because of the seasonal nature of the stove market, American Road needed prompt and properly balanced deliveries of the trim pieces in order to meet its production schedule. Despite this visit and numerous subsequent phone calls, however, Extrusions was late in filling each order, and its partial shipments were often out of balance or unacceptably high in defects. Because of Extrusions' faulty performance, American Road realized less than half its projected sales of Lorraines and Cassandras in 1989 and entered 1990 with large unsold inventories and severe financial problems. This lawsuit followed.

At trial, Agee and the consultant testified that the 1989 sales projections in the business plan were based upon individual customer contacts and were realistic. Agee testified that American Road sold only 741 gas stoves in 1989 solely because of Extrusions' delayed and defective shipments. American Road distributors testified that the company's late market entry in 1989 reduced sales of the Lorraine and the Cassandra in 1990 to only 719 units. American Road's damage expert testified that, assuming the company had achieved its 1989 sales projections of 550 Lorraines and 1100 Cassandras in both 1989 and 1990, its net profits would have increased by $273,600.

The jury's verdict awarded separate damages for each of the four purchase orders. Purchase orders one and four ordered trim pieces for Lorraine stoves; orders two and three ordered trim pieces for the Cassandra. The damage awards totalled $273,600, precisely the damage expert's estimate of the lost profits for both 1989 and 1990. Extrusions argues that no recoverable lost profits were proved under controlling Nebraska law.

The Uniform Commercial Code as enacted in Nebraska allows a buyer to recover consequential damages "of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Neb.Rev.Stat. ch. 91, § 2–715(2)(a) (1992). Under this statute:

> such damages "need not be proved with mathematical certainty, but the evidence must be sufficient to enable the trier of fact, in this case the jury, to estimate with a reasonable degree of certainty and exactness the actual damages.... It is the duty of the District Court to refrain from submitting to the jury the issue of damages where the evidence is such that it cannot determine that issue without indulging in speculation and conjecture."

*El Fredo Pizza, Inc. v. Roto–Flex Oven Co.,* 199 Neb. 697, 261 N.W.2d 358, 363 (Neb. 1978), quoting *Shotkoski v. Standard Chem. Mfg. Co.,* 195 Neb. 22, 237 N.W.2d 92, 97 (Neb.1975). "Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss." *Katskee v. Nevada Bob's Golf of Neb., Inc.,* 238 Neb. 654, 472 N.W.2d 372, 379 (Neb.1991) (internal quotation omitted). As *El Fredo Pizza, Katskee,* and other cases make clear, each identifiable component of a lost profits award must be separately reviewed under these standards. Therefore, we will consider American Road's lost profits evidence separately for each product and each year.

*Lost Sales in 1989.*

For 1989, American Road's business records and the testimony of its witnesses tended to prove that demand for its new stove product, the Cassandra, outstripped American Road's production throughout the key selling months of September, October, and November. The May 1989 business plan projected sales of 1100 Cassandras during the 1989 selling season. American Road ordered trim pieces for 1100 Cassandras and introduced evidence that it could have produced 1100 Cassandras in time for the 1989 selling season but for Extrusions' shipping delays and defective products. On the de-

mand side, two American Road distributors testified that they had anxiously awaited delivery of Cassandras throughout the fall of 1989 and would have purchased hundreds more had they been available during the peak selling season.

Extrusions disputes all this, claiming that American Road's 1989 customer orders demonstrate that it promptly satisfied all the demand there was for Cassandras. Extrusions further argues that American Road's failure to obtain timely American Gas Association certification for the Cassandra contributed to the slower and lower sales of that product in 1989. Finally, Extrusions stresses that the May 1989 business plan's projected sales for this new product were only inflated guesses intended to encourage American Road's bank to continue financing the company.

Extrusions vigorously pressed these arguments at trial and lost. Giving American Road the benefit of all favorable inferences that might be drawn from the evidence, as we must, we conclude that American Road presented sufficient evidence to allow the jury reasonably to conclude that American Road would have sold 1100 Cassandras in 1989 had Extrusions not breached purchase agreements two and three, and that American Road's damage expert had reasonably estimated the lost profits from those lost sales.

On similar facts, the court in *Hydraform Products Corp. v. American Steel & Aluminum Corp.*, 127 N.H. 187, 498 A.2d 339, 345 (N.H.1985), held that there was "no serious question that loss of profit on sales was foreseeable up to the number of … stoves referred to in the [purchase] contract." We agree with the *Hydraform* court's analysis. American Road introduced sufficient evidence that it would have sold the 1100 Cassandras for which it ordered trim pieces to sustain this element of the jury's lost profits award. *Cf. Alliance Tractor & Implement Co. v. Lukens Tool & Die Co.*, 204 Neb. 248, 281 N.W.2d 778 (Neb.1979) (upholding lost profits award supported by comparable business projections and testimony); *Union*

---

2. Under Nebraska law, it is "critical" that business records as well as oral testimony support a

---

*Nat'l Bank v. Mosbacher*, 933 F.2d 1440, 1444–46 (8th Cir.1991) (same).

■ American Road's claim that it lost sales and profits on the Lorraine in 1989 is far less sound. This product was introduced in 1988. Sales in 1988 were far below expectations, and American Road had a substantial inventory of Lorraines throughout 1989. Thus, Extrusions' delays in filling purchase orders one and four did not cause American Road to lose Lorraine sales in 1989. Indeed, American Road ultimately cancelled purchase order four.

American Road argues that it lost Lorraine sales because distributors wanted both products and would have purchased more Lorraines had the Cassandras been available in time for the 1989 selling season. But this inherently speculative argument goes to Extrusions' breaches of purchase orders two and three for the Cassandra trim pieces. The jury awarded additional lost profits of $55,940 on purchase orders one and four for the Lorraine trim pieces. On this record, we must conclude that the lost profits awarded on the Lorraine purchase orders were the product of "speculation and conjecture."

*Lost Sales in 1990.*

■ American Road did not purchase any trim pieces from Extrusions in 1990. It began the year with substantial inventories of both Lorraines and Cassandras and did not have the financial resources to manufacture more stoves. It prepared no sales forecasts for 1990, and the May 1989 business plan did not attempt to forecast 1990 sales.[2] The Cassandra stove had a second unsuccessful season. Distributors who had wanted more Cassandras than were available in 1989 knew that there was no shortage in 1990, yet they purchased fewer Cassandras than they had the year before. American Road discontinued the product in December with over 300 unsold Cassandras in its warehouse.

American Road's damage expert assumed that the 1989 sales projections were reasonable for 1990. But this expert had no first-hand knowledge of American Road's business

---

lost profits claim. *El Fredo Pizza*, 199 Neb. 697, 261 N.W.2d at 365.

and simply relied upon the 1989 business plan. That plan did not forecast 1990 sales. Thus, there was no foundation in the record for the assumption that 1989 sales projections were appropriate for 1990 as well. *Cf. Katskee*, 238 Neb. 654, 472 N.W.2d at 380 (rejecting as speculative expert's projection of lost profits based on assumptions lacking foundation in the record). This critical component of American Road's 1990 damage claim was built on thin air.

American Road argues that the market penetration it failed to achieve in 1989 lost the company additional sales in 1990. However, lack of 1989 market penetration does not explain the drop in sales and distributor interest in 1990. In addition, there is no evidence that Extrusions had reason to know when it accepted purchase orders in 1989 that shipping delays would cause American Road consequential damages in 1990. Thus, American Road lacked the evidence of causation and foreseeability needed to justify these remote-in-time lost profits. *See Alliance Tractor*, 204 Neb. 248, 281 N.W.2d at 782 (lost profits limited to one year); *Hydraform*, 127 N.H. 187, 498 A.2d at 346 (reversing lost profits award for lost sales in the two years following vendor's breach because of "the inability to calculate any such loss with reasonable certainty"). *See also Hoover v. Valley West D M*, 823 F.2d 227, 230 (8th Cir.1987).

Finally, American Road argues that the reduced 1989 revenues caused by Extrusions' late deliveries resulted in lay-offs that had a drastic effect on the company's ability to sell in 1990. We rejected that argument, however, in *Lewis v. Mobil Oil Corp.*, 438 F.2d 500, 508 (8th Cir.1971) ("failure to produce at full capacity [after plaintiff stopped using defendant's defective product] was not due to a breach of warranty but was clearly due to the plaintiff's capital resources").

As to 1990, then, "[t]here simply appears to be a total failure of proof of [consequential] damages." *Settell's, Inc. v. Pitney Bowes, Inc.*, 209 Neb. 26, 305 N.W.2d 896, 899 (Neb.1981). We conclude that on this record American Road's lost profits claim for

1990 rests on pure speculation and conjecture. This portion of the jury's verdict must be reversed.

"In cases where a jury awards actual damages in excess of the amount proved, remittitur to the maximum amount proved is an appropriate remedy." *Knickerbocker v. First Nat'l Bank*, 827 F.2d 281, 289 n. 6 (8th Cir.1987). Here, the jury accepted the lost profits calculations by American Road's damage expert and awarded $273,600. Only the 1989 lost profits on Cassandras are supported by the evidence at trial. The expert testified that American Road's total lost profits in 1989 were $149,985; of that amount, the jury assessed damages of $55,940 on the Lorraine purchase orders. Therefore, the maximum amount proved for remittitur purposes is $94,045.

The judgment of the district court is reversed and the case is remanded for a new trial[3] unless American Road files in the district court, within thirty days after the issuance of our mandate, its consent to a remittitur of the damage award to $94,045.

---

**3.** We conclude that issues of liability and damages are sufficiently interwoven in this case to require a new trial as to both. *See Slater v. KFC Corp.*, 621 F.2d 932, 938 (8th Cir.1980).