EVERGREEN FARMS, A GENERAL PARTNERSHIP, APPELLEE, V.
FIRST NATIONAL BANK & TRUST COMPANY, A NATIONAL BANK,
APPELLANT.

553 N.W.2d 728

Filed October 4, 1996.   No. S-94-546.

Frederick S. Cassman, of Abrahams, Kaslow & Cassman, and Noyes W. Rogers and Clark J. Grant, of Grant, Rogers, Maul and Grant, for appellant.

David E. Copple and Steven D. Sunde, of Domina & Copple, P.C., for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

Wright, J.

# I. INTRODUCTION

Evergreen Farms (Evergreen) brought this action for breach of contract and fraudulent misrepresentation against First National Bank & Trust Company (First National). Evergreen sought to recover damages arising from its loan agreement with First National. A jury awarded Evergreen $172,500, and First National appeals.

# II. FACTS

## 1. Evergreen Farms

Evergreen Farms is a general partnership engaged in farming and cattle feeding. The partners are Julius, Lois, and Ricky Osten. In the 1970's, First National began loaning money to Evergreen. In 1986, Evergreen began custom feeding cattle owned by other ranchers. The cattle owners entered into agreements with Evergreen in which Evergreen agreed to feed the cattle and charge the owners based upon the amount of weight the cattle gained. Evergreen charged a set price that varied from 35 to 51 cents per pound for each pound the cattle gained in the feedlot. This price included feed, overhead, and profit. Evergreen maintained no financial records regarding its custom feeding operation for 1987 and 1988. Its only records were the statements it sent to its customers.

## 2. Loan Agreements

On April 24, 1986, a Farmers Home Administration (FmHA) guaranteed loan to Evergreen was approved. This loan, which was managed by First National, was in the form of a master note evidencing a revolving loan with a 3-year life. A total amount of $50,000 could be extended to Evergreen under the condition that all but $10 had to be repaid to First National each year before any additional money could be loaned.

Bank records indicate that $9,000 was initially loaned to Evergreen on May 14, 1986. Evergreen repaid $8,990 to First National on May 19. An additional $40,010 was loaned to Evergreen on December 19. These funds were to be paid back sometime in May 1987.

In May 1987, Julius Osten spoke to Larry Harkrader, vice president of commercial lending at First National, and told him that funds were available to pay off the FmHA loan, but that an additional 1,100 head of cattle were being moved into Evergreen's custom feeding operation. First National was then asked if it would give Evergreen permission to use the funds that would have been used to pay off the FmHA loan for additional operating expenses. Harkrader approved the use of the funds for that purpose instead of requiring that the FmHA loan be paid off in full.

On October 19, 1987, Evergreen paid $49,990 on the FmHA guaranteed loan pursuant to the requirements of the master note. Evergreen subsequently requested to have money advanced under the master note, but First National denied the request.

In addition to the guaranteed FmHA loan, Evergreen had a separate letter of credit from First National for $50,000 dated January 26, 1987. This money was to be loaned to Evergreen so that it could expand its feeding operation. First National did not loan any of these funds to Evergreen.

Along with the $100,000 credit represented in the above agreements, Evergreen had also applied for a $100,000 loan in September 1987. First National also denied this request. First National claimed that it did not loan Evergreen additional funds because Evergreen did not pay its loan balance down to $10 when the loan became due in May 1987. First National also claimed that Evergreen's cash-flow predictions for 1988 indicated Evergreen did not actually need the money.

Evergreen claimed that First National's refusal to loan it $100,000 caused Evergreen to sustain immense losses due to lost profits, silage spoilage, and increased cost of feed. Julius Osten testified that he met with a First National loan officer in early 1987 and requested an additional $50,000 to buy high moisture corn in September, October, and November. First National's January 26, 1987, letter to Osten informed him that the senior loan committee had agreed to make an additional operating loan of $50,000 to Evergreen subject to the conditions that livestock and feed inventory reports were to be submitted on a regular basis and a 1985 income tax return was to

be submitted. Osten claimed that he received First National's approval in May 1987 to use the $50,000 FmHA guaranteed loan to buy corn.

In September 1987, Julius Osten met with Clark Lehr from First National and asked for additional financing to buy more wet corn in October. Lehr's letter of September 18, 1987, advised Osten that First National would not extend additional credit beyond Evergreen's current loan commitments. The letter stated:

> Yesterday the Senior Loan Committee considered your request for additional financing to purchase wet corn this fall. It was the decision of the Committee that the First National Bank will be unable to extend additional credit beyond your current loan commitments.
>
> In carefully reviewing your request, the bank does not feel comfortable enough with the cash flow of your operation to extend additional credit. The cash flow you submitted for 1987 indicated that your present operating loan would be paid to a zero balance sometime in May, and you would be operating on your own cash for the balance of the year. Currently your operating loan is at its maximum balance of $50,000.00 and has been there since the first of the year. If you are successful in repaying this loan in the next thirty days as you have indicated, then this note would be available to cover wet corn purchases for the upcoming year. To meet FmHA requirements, we would need a cash flow for 1988 indicating the repayment of these funds before they could be disbursed.
>
> The bank certainly acknowledges that there could be wet corn available during harvest at what may turn out to be an attractive price. Please understand that any additional loan commitment we extend to you will be completely outside your 90% FmHA guarantee framework, which further complicates your request.
>
> Thank you for submitting your tax returns and they are available for you to pick up here at the bank the next time you are in.

Julius Osten testified that on October 19, 1987, Evergreen paid $49,990 plus interest on its $50,000 FmHA guaranteed

loan, leaving a balance of $10. Osten claimed First National told him that if he did not pay the note, First National could not lend him more money. Osten stated that he again went to First National during the last week of October and asked for $100,000 to buy wet corn, referring to the $50,000 FmHA guaranteed loan and the $50,000 letter of credit dated January 26, 1987. Osten testified he was told that according to " 'your cash flow, you don't need it. We are not going to borrow it to you.' " Evergreen then discontinued banking with First National and did not obtain any further bank credit until the fall of 1989, when an operating loan of $165,000 was approved by the Schuyler State Bank.

### 3. TRIAL

In its petition, Evergreen sought damages for (1) lost profits from the feeding operation, (2) spoilage and shrinkage of silage, and (3) increased costs of feed because Evergreen was forced to buy wet corn as funds became available. Evergreen alleged that First National refused to lend the funds pursuant to the FmHA guaranteed loan and the January 26, 1987, letter of credit and that this refusal resulted in Evergreen sustaining losses.

The case was tried to a jury in the district court for Platte County. On March 3, 1994, the jury awarded Evergreen $172,500. First National filed a motion for new trial, which motion was overruled. First National appealed to the Nebraska Court of Appeals, and we removed the case to our docket.

### III. ASSIGNMENTS OF ERROR

First National asserts that the district court erred in (1) submitting the issue of loss of profits to the jury and admitting Julius Osten's unsupported testimony that Evergreen lost profits of 10 cents per head per day for 2 years (730 days), (2) admitting into evidence Evergreen's combined tax returns, (3) allowing expert testimony regarding the reasonable standard of profits in the cattle industry, (4) submitting Evergreen's claim for damages due to the varying prices of corn to the jury, (5) submitting Evergreen's claim for spoilage of silage to the jury, (6) submitting Evergreen's claim for breach of contract to the jury, (7) submitting Evergreen's claim of misrepresentation to

the jury, (8) overruling First National's motion for directed verdict, and (9) overruling First National's motion for new trial.

## IV. ANALYSIS

### 1. BREACH OF CONTRACT

First National argues that the January 26, 1987, loan agreement required Evergreen's performance of two conditions precedent: (1) submit livestock and feed inventory reports on at least a quarterly basis and (2) provide a copy of Evergreen's 1985 income tax returns and 1986 income tax returns when completed. First National claims that Evergreen failed to prove at trial that it performed those conditions, that the district court did not properly instruct the jury on this issue, and that, therefore, the court erred in submitting Evergreen's claim for breach of contract to the jury.

First National did not object or offer more specific instructions regarding the elements of breach of contract when the court's instructions were submitted to counsel for review. The failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error. *Barks v. Cosgriff Co.*, 247 Neb. 660, 529 N.W.2d 749 (1995); *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994). We conclude that First National is precluded from raising this objection on appeal and that plain error does not exist with regard to the instructions given to the jury. Whether Evergreen complied with the requirements of the contract between Evergreen and First National was a question of fact which the jury resolved in favor of Evergreen. This assignment of error is without merit.

### 2. FRAUDULENT MISREPRESENTATION

First National argues that the district court erred as a matter of law in submitting Evergreen's fraudulent misrepresentation claim to the jury. In order to maintain an action for fraudulent misrepresentation, the plaintiff must allege and prove the following elements: (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without

knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff did so rely; and (6) that he or she suffered damage as a result. *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 518 N.W.2d 910 (1994). An issue should be decided as a matter of law only where reasonable minds cannot differ and can draw but one conclusion from the evidence. See *Ochs v. Makousky*, 249 Neb. 960, 547 N.W.2d 136 (1996).

Evergreen alleges First National falsely represented that $100,000 would be advanced to Evergreen for 1987 operating expenses. Julius Osten testified that when he asked Harkrader, First National's vice president of commercial lending, to lend Evergreen the money to buy corn, he was told that " '[a]ccording to your cash flow, you don't need it. We are not going to borrow it to you.' " Osten further testified that he was told by Harkrader, " 'We was [sic] going to sell you out once, we can do it again.' " There was conflicting testimony by First National officials as to why Evergreen was not given further credit.

The issue of fraudulent misrepresentation was a question of fact for the jury, and the district court could not have decided this issue as a matter of law. This assignment of error is without merit.

### 3. SUFFICIENCY OF EVIDENCE ON DAMAGES

First National asserts that the evidence was insufficient to support the damages awarded by the jury.

#### (a) Lost Profits

We first address the sufficiency of the evidence as to the damages for lost profits. While lost profits need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988).

The principal issue is whether the evidence was sufficient to permit Evergreen to recover damages for lost profits caused by First National's failure to loan $100,000 to Evergreen. The focus is whether it is reasonably certain that such lost profits would have been realized and that such profits "can be ascer-

tained and measured from the evidence introduced with reasonable certainty. Such lost profits must not be speculative . . . but must be established with reasonable certainty by the evidence." See *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 199 Neb. 697, 706, 261 N.W.2d 358, 364 (1978). Accord *K & R, Inc. v. Crete Storage Corp.*, 194 Neb. 138, 231 N.W.2d 110 (1975).

To support its claim for lost profits, Evergreen offered the testimony of Julius Osten and Dr. Gene Murra. Osten testified that in 1986, Evergreen entered into agreements with various ranchers to feed their cattle on the basis of a guaranteed cost of weight gain. Evergreen did not keep records regarding its custom cattle feeding operation for the years 1987 and 1988, and there were no records to support its claim for lost profits of 10 cents per head per day for 2,000 cattle for 730 days.

Julius Osten testified that when First National refused to lend the money, Evergreen had insufficient capital to make advance purchases of corn to lock in the current market price. Evergreen claimed that because it was unable to offer customers a guaranteed cost of gain, it lost customers. Osten assumed Evergreen would have had an additional 2,000 head of cattle for 2 years. He further assumed that Evergreen would have made a profit of 10 cents per head per day for the entire 2-year period.

Julius Osten stated that Evergreen charged a set price which varied from 35 to 51 cents for each pound the cattle gained while in Evergreen's feedlot. As a part of the set price, Osten included 5 cents for overhead expenses and 10 cents for profit. Osten's opinion regarding lost profits was based upon his education, experience, training, and knowledge in the custom cattle feeding business from 1986 to 1992.

Over First National's objection as to foundation, Julius Osten was allowed to give his opinion that the net earnings would be 10 cents per head per day. His assumption was based upon the fact that Evergreen was feeding 3,500 to 4,000 head of cattle and "all of a sudden we dropped down to from 1,500 to 2,000 for two years." Osten stated that Evergreen lost customers as a result of not being able to guarantee a cost of gain, but he did not set forth the number of cattle involved. Osten

gave his opinion that Evergreen would have had net earnings of 10 cents per head per day for 2,000 head for 2 years. The basis for this opinion was that it took Evergreen 2 years to get enough customers to get its feedlot back to where it was previously. It took 2 years because there were too many feedlots and not enough cattle. Osten calculated his loss of profit by taking 2,000 head of cattle times 10 cents times 730 days.

On cross-examination, Julius Osten testified that when he fed cattle on a guaranteed cost of gain, he guaranteed that the cattle would gain so much weight, and if they did not gain that much weight, he could lose money. He admitted that he really did not know on a guaranteed cost of gain how much money the cattle would make until after he fed them.

A claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness. See *Quad-States, Inc. v. Vande Mheen*, 220 Neb. 161, 368 N.W.2d 795 (1985). While damages for lost profits need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Katskee v. Nevada Bob's Golf of Neb.*, 238 Neb. 654, 472 N.W.2d 372 (1991).

The evidence was insufficient to establish with reasonable certitude that Evergreen would have fed 2,000 head of cattle at a net profit of 10 cents per head per day for 730 days. Evergreen's tax returns for the years 1986 through 1990 were prepared on a cash basis, but did not separately reflect profits and losses on Evergreen's custom cattle feeding and therefore did not accurately report the profit and loss of the cattle feeding operation. In addition, Julius Osten produced no business records to support the claim. Thus, Osten's testimony was insufficient to support the jury's award for damages for lost profits.

Murra, a livestock extension marketing specialist, testified that in his opinion, a fee of 10 cents per head per day was a reasonable standard for profit in the cattle industry. Murra stated that he was not offering an opinion regarding what profits Evergreen might have made in the future. He was only testifying about reasonable industry standards.

In *Katskee*, an expert testified regarding lost profits due to the defendant's not being able to expand its store into an adjacent space. We noted that the expert assumed that the only difference between the two locations was square footage and that he used sales figures from a different time period. No studies were made to establish whether there was any change due to these differences, and the expert did not evaluate whether there was a change in the number of competitors or consumer interest in the product. We held that the evidence was too speculative and conjectural, and failed to establish damages with reasonable certainty.

In *Rambo v. Galley*, 188 Neb. 692, 199 N.W.2d 14 (1972), the plaintiff sought to recover damages from the defendants for operating an employment agency in competition with the plaintiff. The plaintiff argued she would have had a greater increase in gross income and profits for a year had the defendants not started a competing agency. However, there was no evidence to indicate what the value of that lost business would be because the plaintiff did not have records to substantiate her claims for damages. We held that the plaintiff failed to establish her damages with reasonable certainty and reasoned that there must be sufficient evidence to enable the court, with a certain degree of exactness, to estimate a plaintiff's damages.

It is the duty of the district court to refrain from submitting to the jury the issue of damages where the evidence is such that it cannot determine that issue without indulging in speculation and conjecture. *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 199 Neb. 697, 261 N.W.2d 358 (1978). See, also, *Quad-States, Inc. v. Vande Mheen, supra*. We conclude that Evergreen's proof regarding lost profits is too speculative and conjectural, and that the district court erred in submitting the issue of lost profits to the jury.

### (b) Varying Prices of Corn

Evergreen claimed that First National's refusal to advance additional money to Evergreen for the purchase of wet corn caused it to pay higher prices for the corn. Julius Osten testified that the purpose of obtaining the $100,000 loan was to "buy feed mostly and to pay running expenses." Prior to the

end of October 1987, when First National declined to lend Evergreen additional funds, Evergreen had purchased 20,845.6 bushels of wet corn at prices ranging from $1.32 to $1.62 per bushel.

Julius Osten testified that with the $100,000 he could have purchased corn for $1.30 to $1.35 per bushel. He then calculated that he could have purchased 76,930 bushels for $100,000. Since he did not have the money, he did not purchase the corn at this price level and, therefore, could not guarantee a cost of gain.

In summary, Evergreen contends that it would have purchased 76,930 bushels of corn in October 1987 using the $100,000 requested from First National and that it subsequently purchased various amounts of corn at an average price of $2.13 per bushel plus 10 cents per bushel for hauling. From our review of the record, we find that the evidence was insufficient to support this claim for damages. The amount of corn Evergreen would have or could have purchased for $1.30 was never established. On cross-examination, Julius Osten testified that he had speculated corn would go to $1 per bushel and that Evergreen did not start buying more corn until December 1987. We find that the evidence was insufficient to support Evergreen's claim that it would have purchased 76,930 bushels of corn at $1.30 per bushel. The jury could only guess at how much corn Evergreen would have purchased at this price.

### (c) Silage Spoilage

Evergreen claimed that it had approximately 7,500 tons of silage on hand in the fall of 1987. According to Julius Osten, approximately 10 percent of this silage spoiled because there were not enough cattle in the feedlot to consume the silage as a result of First National's denial of the loan. Osten stated that the customary valuation of silage is 10 times the price of corn per hundredweight of silage. Murra testified that this calculation was a customary method of silage valuation in the cattle industry, but did not testify regarding Evergreen's damages.

Julius Osten testified that there were not enough cattle to consume the silage and that, therefore, "a foot and a half, maybe two foot," of the silage pile spoiled. Osten testified he

determined the amount of silage that had spoiled by simply looking at the pile, which consisted of approximately 7,500 tons. Osten figured the value of the silage based on the price per bushel of corn at $2.50 times 10, or $25 per ton.

In the fall and winter of 1987 and in the spring and summer of 1988, Evergreen had at least 3,000 head of cattle to feed. Julius Osten's opinion about how much silage spoiled and why it spoiled was a guess and nothing more. How much silage spoiled and why it spoiled were not established with any degree of certainty, and the jury would again be required to indulge in speculation and conjecture. The evidence was insufficient to establish this claim for damages.

## V. CONCLUSION

We find that the evidence was insufficient to prove Evergreen's damages. "[D]amages, like any other element of a plaintiff's cause of action, must be pled and proved, and the burden is on the plaintiff to offer evidence sufficient to prove plaintiff's alleged damages." *Howells Elevator v. Stanco Farm Supply Co.*, 235 Neb. 456, 463, 455 N.W.2d 777, 782 (1990). It is the duty of the district court to refrain from submitting to the jury the issue of damages where the evidence is such that it cannot determine that issue without indulging in speculation and conjecture. *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 199 Neb. 697, 261 N.W.2d 358 (1978).

For the foregoing reasons, the judgment entered by the district court in favor of Evergreen must be and is hereby reversed, and the cause is remanded to the district court with directions to dismiss.

REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.