# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1049

_____

Robert Racicky and Debra Racicky,    *
Husband and Wife; Greg Racicky and  *
Joyce Racicky, Husband and Wife,    *
d/b/a Elk Creek Dairy,                *
                                   *
       Appellees,            *
                                   *   Appeal from the United States
    v.                   *   District Court for the
                                   *   District of Nebraska.
Farmland Industries, Inc.,       *
                                   *
       Appellant.           *

_____

Submitted: October 7, 2002

Filed: May 1, 2003
_____

Before McMILLIAN, LAY, and RILEY, Circuit Judges.
_____

RILEY, Circuit Judge.

      Robert Racicky, Debra Racicky, Greg Racicky and Joyce Racicky (Racickys) operate a commercial dairy farm in Nebraska and brought a negligence action against Farmland Industries, Inc. (Farmland), a Kansas corporation with its principal place of business in Missouri. The Racickys alleged Farmland's negligent feed ration advice injured their dairy cows. A jury found for the Racickys and calculated their damages in the amount of $778,496, but also found the Racickys to be 10% at fault.

Denying Farmland's motion for judgment as a matter of law or, in the alternative, a new trial, the district court entered judgment for the Racickys in the amount of $700,646.40, plus costs and interest. On appeal, Farmland contends the Racickys failed to produce sufficient evidence on the issues of agency, standard of care, proximate cause and lost profits. We conclude the evidence supports the jury's findings on liability and on lost market value damages, but does not support a jury award for lost profits.

## I.    BACKGROUND

The Racickys operate Elk Creek Dairy, an award-winning commercial Holstein dairy farm in central Nebraska. Greg Sherwood (Sherwood), a sales and marketing manager and a dairy specialist with the Aurora, Nebraska, Cooperative Elevator Company (Co-op), approached the Racickys in April 1996 about providing them feed rations and ration advice to increase milk production for their herd.[1] Thereafter, the Racickys used Sherwood for ration advice. The Racickys claim they hired Sherwood for his access to Farmland technical support. During the relationship, Sherwood used Farmland employees, information, advice, and computer software to prepare rations for the Racickys. Sherwood also provided the Racickys with Farmland brochures, literature and joint Co-op/Farmland advertising. In 1997, after Sherwood nominated the Racickys for a Farmland dairy award, Farmland flew Robert and Debra Racicky to Kansas City to receive the Farmland award.

The Racickys had never purchased Farmland or Co-op corn for their rations until August 1998, at which time they bought corn from Sherwood. The record reveals this new corn was finely ground. After eating the rations with the new corn,

---

[1]Feed rations are created for dairy herds to meet their dietary needs. Rations are made up of forage and concentrate. The forage usually consists of alfalfa and hay to provide the necessary fiber. The concentrate is grain and protein derivatives.

the Racickys' cows experienced rumenal acidosis.[2] The Racickys claim this condition was caused by the new rations, specifically, the fine ground corn which was "too hot" and fermented too fast in the cow's rumen.[3] Out of a herd of 219 cows, fifteen of the Racickys' cows died and 151 became very ill after eating the new rations. Some of the 151 sick cows were kept as cull cows (to produce offspring) and others were sold. After August 1998, the Racickys suffered a decrease in milk production, from approximately 23,666 pounds of milk per cow per year to approximately 17,100 pounds of milk per cow per year. Because all four issues in this case are fact-intensive, we will discuss additional facts as necessary to resolve each issue.

## II.    DISCUSSION

### A.    Standard of Review

We review de novo the district court's denial of Farmland's post-verdict motion for judgment as a matter of law. Bass v. GMC, 150 F.3d 842, 845 (8th Cir. 1998). We must decide "whether the record contains sufficient evidence to support the jury's verdict." Id. In doing so, "we must examine the sufficiency of the evidence in the light most favorable to the [Racickys] and view all inferences in [their] favor." Id. We must remain mindful that "[j]udgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the [Racickys'] position." Id. (citations and quotations omitted). As this is a diversity action, we must apply Nebraska negligence law. Jordan v. NUCOR Corp., 295 F.3d 828, 834 (8th Cir. 2002).

---

[2]According to the Racicky's veterinarian, rumenal acidosis "is caused by the rapid absorption of highly fermentable carbohydrates that produces an excess of ruminal organic acids."

[3]A cow has four stomachs – the rumen, reticulum, omasum and abomasum, which is the true stomach. A cow's food ferments in its rumen, the largest of the four stomach components, where microbes break down the food before it is passed to other digestive compartments.

**B.    Agency**

Farmland argues the Racickys failed to prove Sherwood was Farmland's apparent agent.  According to the Nebraska Supreme Court, apparent authority to act as another's agent may only be conferred "if the alleged principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon the apparent authority." Franksen v. Crossroads Joint Venture, 515 N.W.2d 794, 801 (Neb. 1994). The "apparent authority or agency for which a principal may be liable must be traceable to the principal and cannot be established by the acts, declaration, or conduct of the agent." Id.  Furthermore, "[o]ne who is placed on inquiry as to an agent's or employee's authority, and who has reasonable means of making inquiry, occupies the same position in law as if he had actual knowledge of the employee's lack of authority, because he is charged with knowledge of the facts which the inquiry would have developed." Id.

Acknowledging the closeness of the apparent agency issue, we find the record contains sufficient evidence to support the district court's decision to submit the agency question to the jury.  Although Farmland makes a compelling argument that the record does not support a finding of apparent agency, this argument was for the jury, who rejected it.

Sherwood first visited the Racickys' farm in April 1996, and gave them his Co-op business card.  At times two others, Jeff Wheeler (Wheeler) and Vaughn Studer (Studer), visited Racickys' farm with Sherwood, their business cards showed they were Farmland employees.  After the Racickys hired Sherwood, they only paid the Co-op for materials and services, and did not establish a financial relationship with Farmland.  This evidence tends to negate an inference of apparent agency.

The record also contains evidence supporting the Racickys' claim that Sherwood was Farmland's agent.  Sherwood, Studer, and Wheeler each gave Farmland brochures to the Racickys.  Sherwood nominated the Racickys for a

-4-

Farmland dairy award, which Farmland presented to the Racickys in 1997. Farmland provided Robert and Debra Racicky an all-expenses paid trip to Kansas City to receive their award at a Farmland banquet. At this event, Farmland gave the Racickys information and gifts. The Racickys could have reasonably inferred Farmland was bestowing gifts and awards to them based on Sherwood's recommendation.

The Co-op was a Farmland associated co-op, authorized to use Farmland's logos, brand name, advertisements and literature. Farmland also developed joint advertisements for the Co-op to use. A Farmland advertisement included the following words: "Technical Services – People are our most valuable resource." Under this heading, Farmland listed a number of positions, including: "Local Retail Sales Specialists (Contact the Nearest VIP Account)." The Aurora Co-op was considered a Farmland VIP account.

Sherwood used Farmland on a regular basis to create, modify and build rations. Sherwood sometimes submitted his rations directly to Farmland for advice and other times he would just talk to Farmland on the telephone. In building the Racickys' rations, Sherwood used the Brill computer program acquired from Farmland, and he had unlimited access to Farmland's technical support regarding the computer program. When Sherwood designed a ration using the computer program, the printouts he gave to the Racickys were entitled "Farmland Industries Suggested Batch Sheet" and "Farmland's Summary of Suggested Rations."

Farmland assisted Sherwood by giving him direct access to its veterinarians and its research and feed consultants, which Robert Racicky testified was important and induced him to hire Sherwood. Sherwood consistently availed himself of Farmland's services, which cemented the Racickys' belief that Sherwood was

Farmland's agent.[4]  Sherwood also visited the Racickys' farm with Farmland employees, whom Sherwood consulted before giving his ration advice to the Racickys.

When asked whether his decision to use Sherwood was based on anything Farmland did, Robert Racicky said,  "I went with Sherwood because, you know, I wanted all this experience that was behind Aurora's Co-op with Farmland."  When asked whether Sherwood was from the Co-op, Robert said, "Not necessarily from – I mean, how do you look at Aurora Co-op and Farmland?  They are both the same thing."

Viewing the evidence in the Racickys' favor and giving them the benefit of all reasonable inferences, a jury could reasonably infer the Racickys used Sherwood because they believed he was Farmland's agent.  Whether Farmland led the Racickys to believe Sherwood was Farmland's agent was properly submitted to the jury.

## C.    Negligence
### 1.    Standard of Care

In a negligence case involving an "alleged tort-feasor [who] possesses special knowledge, skill, training, or experience," the standard of care is not that "of a reasonably prudent person," but that of a person with "specialized knowledge, skill, and other qualities." Cerny v. Cedar Bluffs Junior/Senior Pub. Sch., 628 N.W.2d 697, 704 (Neb. 2001).  Farmland argues Sherwood's ration advice in August 1998 regarding fine ground corn did not breach the applicable standard of care.  The Racickys counter that Sherwood controlled the rations, which rations were "too hot" because of a high concentrate level based on the fine ground grain.  Under Nebraska

---

[4]For example, in August 1998, Greg Racicky and Sherwood sat in Sherwood's truck on the Racickys' farm discussing the herd.  To obtain technical assistance on a problem they were discussing, Sherwood used his cellular phone to call Dr. William Knapper, a Farmland veterinarian.

law, the applicable standard of care for Sherwood's ration advice was whether a reasonable dairy feed specialist, with specialized knowledge, skill, training and experience, would have recommended using rations with the size of grain particles actually fed to the Racickys' dairy herd in August 1998.

Negligence and the standard of care "do not exist in the abstract, but must be measured against a particular set of facts and circumstances." Id. The fact-finder must "determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard." Id. at 705. Whenever "specialized knowledge, skill, or training" is involved, expert testimony may be necessary to determine what standard of care is required under the particular circumstances involved. Id.

Farmland contends the only evidence on this issue establishes that the use of fine ground corn in August 1998 was reasonable. Both Sherwood and Dr. Paul Johnson (Johnson), a veterinarian called by Farmland, testified to that effect. However, viewing the evidence in the light most favorable to the Racickys, the record contains sufficient evidence that Sherwood's recommended use of fine ground corn breached the standard of care.

Several witnesses testified to the corn's size. Dr. Wallace Wass (Wass), a veterinarian, saw corn at the Racicky farm that looked like swine feed, which is more finely ground than cow feed. Robert Racicky, who had been farming for forty years, testified the corn used in the rations in August 1998 "looked like corn meal." Furthermore, he testified that, once he used the new ration with the new Farmland corn in August 1998, disaster struck. Greg Racicky testified the corn the Co-op supplied in the summer of 1998 was different from the corn the Racickys had been feeding their cows: "Theirs looked like soy bean meal or just a little bit coarser. . . .

Probably just a little bit larger texture than corn meal." These three witnesses showed clear surprise at how finely ground the corn was.

Doug Weich (Weich), an independent dairy nutritionist, said, "I felt that the cause in feeding rations that were, in the industry, that we consider to be too hot, high concentrate level." Dr. Randall Pedersen (Pedersen), a long-time veterinarian working with nutritionists in his practice and having extensive knowledge of cows' nutrition, testified that nutrition is the basis for livestock production, noting he evaluates feed from a livestock or feedbunk perspective. Pedersen explained a cow's diet and the forage to concentrate ratio, noting specifically how fine ground corn was used in the Racickys' rations received from Farmland. When considering the cause of the health problems the Racickys' herd was experiencing in 1998, Pedersen consulted Weich, and also observed the cows and the rations. Pedersen opined the herd's health problems were caused by "[s]ubacute rumenal acidosis due to improperly put together ration." He concluded the problem with the ration was that "[i]t was very fine" and the corn in it was "fine."

Sherwood's rations contained fine ground corn, which Farmland produced and the Co-op delivered. Relying on Sherwood's ration advice, the Racickys fed these rations to their herd and 166 cows either died or became sick. Given the combined testimony of Wass, Pedersen, Weich and the Racickys, the standard of care became a disputed fact issue, and the jury measured the standard of care "against a particular set of facts and circumstances."[5]

---

[5]Farmland also argues Sherwood only recommended fine ground corn, but that the actual corn the Co-op delivered to the Racickys could have been more finely ground, which would mean Sherwood's advice did not breach the standard of care. Sherwood, Wheeler, and Studer were on the Racickys' farm many times. Sherwood's Co-op delivered the Farmland corn to the Racickys. Grain size, whether it met the standard of care and whether Sherwood recommended the actual grain size the Racickys used, was properly before the jury.

## 2.    Proximate Cause

Farmland contends the record contains insufficient evidence to show Sherwood's ration advice proximately caused injury to the Racickys' herd. "A proximate cause is a cause (1) that produces a result in a natural and continuous sequence and (2) without which the result would not have occurred." Meyer v. State, 650 N.W.2d 459, 463 (Neb. 2002). "The issue of proximate cause, in the face of conflicting evidence, is ordinarily a question for the trier of fact." World Radio Lab., Inc. v. Coopers & Lybrand, 557 N.W.2d 1, 13 (Neb. 1996). Farmland makes a hyper-technical argument that the evidence shows the rations generally–and not the corn specifically–caused the health problems. Farmland also points to conflicting testimony as to when the health problems began, noting the Co-op did not deliver Farmland corn until August 1998.

Johnson testified that fine ground corn and rations with fine ground corn did not cause herd-wide acidosis. Pedersen, on the other hand, considered potential causes and eliminated all causes except one: "Subacute rumenal acidosis due to improperly put together ration." Dr. Randall Anderson (Anderson), a Nebraska veterinarian, testified "Dr. Pedersen probably sees more cows than any other veterinarian in the state of Nebraska, so I knew he was perfectly capable of handling the situation." Weich, the nutritionist, testified he believed the herd-wide health problems were caused by the feeding rations. Wass testified the cause of the acidosis "absolutely had to be related to feeding a very high energy ration in a form that was finely divided, very finely ground that obviously didn't provide enough roughage effect to prevent the acidosis that developed in these animals." Greg and Robert Racicky testified their cows had no health problems when the Racickys were grinding their own corn, but the herd began experiencing health problems when they started using the fine ground corn from Farmland.

The jury answered the proximate cause question. Based on this record, we will not question the jury's answer.

**D.     Damages**

Once the Racickys proved Sherwood's negligent ration advice caused damage to the herd, the Racickys were entitled to damages. For personal property that cannot be restored to substantially its prior condition, "the measure of damages is the lost market value plus the reasonable value of the loss of use of the property for the reasonable amount of time required to obtain a suitable replacement." Chlopek v. Schmall, 396 N.W.2d 103, 110 (Neb. 1986). "Where property used for commercial or business purposes cannot be rented, then loss of profits may establish the reasonable value of the loss of use."[6] Id. The district court instructed the jury that the Racickys were entitled to lost market value damages and temporary loss of use or lost profits damages, if proven.

The jury found the Racickys' damages to be $778,496, but the jury was not asked to separate its findings on damages. Thus, we do not know how much the jury awarded for lost market value and for lost profits. The parties seem to agree on the lost market value portion of the damages award. Farmland's appeal concerns only the lost profits aspect of the jury's award.

**1.     Lost Market Value**

Lost market value "is the difference in the market value of the property immediately before and after the injury." Shotkoski v. Standard Chem. Mfg. Co., 237 N.W.2d 92, 98 (Neb. 1975). The Racickys claim the jury found their lost market value damages to be $221,800.[7] Farmland does not dispute this calculation.

_____

[6]It is undisputed the Racickys were unable to replace the injured cows by renting or purchasing cows.

[7]This conclusion is based on the following calculation: (1) 15 dead cows, with a lost market value of $1,700 each, equals $25,500; and (2) 151 damaged cows, with a lost market value of $1,300 each ($400 fair market value), equals $196,300. This calculation is supported by the record. Greg Racicky testified a cow in good health is worth $1,700 and 15 died. He then testified that 75% of the other cows were

Farmland asks this court to modify the district court's judgment by reducing the Racickys' damages to only those for direct injury to the cows, i.e., $221,800 reduced by the 10% fault assessed to plaintiffs, i.e., $199,620. Because sufficient evidence exists on lost market value damages, the district court properly submitted this element of damages to the jury.

### 2. Lost Profits

The Nebraska Supreme Court explains when lost profits may be recovered:

> [A] claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness. Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. Loss of prospective profits may be recovered if the evidence shows with reasonable certainty both its occurrence and the extent thereof.

World Radio Lab., 557 N.W.2d at 13 (citations omitted); see Evergreen Farms v. First Nat'l Bank & Trust Co., 553 N.W.2d 728, 734 (Neb. 1996) ("lost profits need not be proved with mathematical certainty," but cannot be based on "evidence which is speculative and conjectural"). "The certainty requirement for the recovery of lost profits balances the defendant's right to avoid liability out of proportion to its culpability against the plaintiff's right to full compensation." Triple R Indus., Inc. v. Century Lubricating Oils, Inc., 912 F.2d 234, 238 (8th Cir. 1990). "The law generally is unfavorable to the recovery of losses of profits in tort actions." Id. (quoting K & R, Inc. v. Crete Storage Corp., 231 N.W.2d 110, 114 (Neb. 1975)).

Our court has recognized, "under Nebraska law, the key to establishing lost profits is the establishment of a course of business activity through business records."

---

acutely injured and had to be sold for $400.

Triple R Indus., 912 F.2d at 238; see American Rd. Equip. Co. v. Extrusions, Inc., 29 F.3d 341, 344 n.2 (8th Cir. 1994) ("Under Nebraska law, it is 'critical' that business records as well as oral testimony support a lost profits claim.") (citing El Fredo Pizza, Inc. v. Roto-Flex Oven Co., 261 N.W.2d 358, 365 (Neb. 1978)); K&R, Inc., 231 N.W.2d at 116 (holding plaintiff failed to prove lost profits with reasonable certainty by relying solely on oral testimony and failing to produce available records).

We are at a loss to know how the jury here calculated the damages award.[8] Claiming "voluminous damages evidence was adduced at trial," the Racickys direct our attention to voluminous pages of the record.[9] The oral testimony of Robert and Greg Racicky on lost profits involved mere speculation and conjecture. No independent experts testified to the Racickys' lost profits. No business records supporting lost profits were offered. Without financial data establishing profitability, the lost profits award cannot stand.

The Racickys reference how they bought their land, made improvements, expanded their herd, built a six-figure equity, sustained substantial depreciation and

---

[8]We are reminded of the pasta sauce commercial where the actor claims "It's in there!" When discussing whether sufficient evidence exists in the record to support a lost profits claim, the Racickys claim "It's in there," while Farmland claims "It's not in there."

[9]We are frustrated by the failure of the Racickys to cite specifically to the record in support of their lost profits argument. See Fed. R. App. P. 28(a)(7) (briefs must contain "a statement of facts relevant to the issues submitted for review with appropriate references to the record"); Fed. R. App. P. 28(a)(9) (briefs must cite to authorities and the record in the argument section); DiCarlo v. Keller Ladders, Inc., 211 F.3d 465, 468 (8th Cir. 2000) (admonishing appellant's "counsel for wasting this Court's limited resources" by submitting a brief that lacked "even rudimentary citations to the record"). With a record spanning thousands of pages, citing scores of scattered pages at a time is not helpful.

purchased a $23,587 grinder. Such general information does not furnish a jury with a reasonably certain factual basis for computing lost profits.

The Racickys' lost profits argument relies on their theory that lost milk production equals lost profits. The Racickys contend the jury awarded them damages for the milk loss sustained for one full lactation period for the cows that were killed or injured, contending the value of one lactation's milk loss totals $502,067. The Racickys reason that 166 cows were unable to produce any milk, and each cow would have produced 23,430 pounds of milk per year. The Racickys testified they would have received 13.5 cents per pound of milk, which takes into account the cost of hauling the milk. We calculate the total payment for this milk production would have been $525,066.30, even though the Racickys used the number $502,067. The Racickys then contend all of this would have been profit, as they would not have incurred additional expenses producing this milk. Based on this reasoning, the Racickys argue the jury's award includes at least one full year's lactation and part of a second, resulting in approximately $556,696 for lost profits. The Racickys also claim the jury awarded them veterinary expenses, even though the jury was only instructed on fair market value reduction and temporary loss of use damages.

The Racickys fail to cite a Nebraska case that allows lost production to substitute for lost profits. See Shotkoski, 237 N.W.2d at 97 (lost profits and lost production involve different questions). Lost production and lost profits are not necessarily, if ever, synonymous.

Before discussing the lost profits further, we first note the record is devoid of evidence supporting the lost production claim. No testimony or records support the contention the Racickys' herd lost an entire lactation year due to the injuries caused by the rations containing the fine ground corn. The evidence does not show the

herd's milk production dropped to zero.[10]  Robert and Greg Racicky testified that, at the time of trial in August 2001, the herd's production average was a little over 18,000 pounds of milk per cow per year.  Robert testified that, in August 1998, the average was over 23,000 pounds of milk per cow per year, but dropped to below 17,000 pounds of milk per cow per year after the health problems.  Robert testified the lowest average was 17,100 pounds.  He also testified that, at the time of trial, he was milking 127 cows.  The Racickys never lost a year's lactation production.

Even if Racickys had provided evidence they lost an entire year's lactation, they were required to prove how lost production related to lost profits.  If we understand the Racickys' argument, they claim a single lactation cycle involving 166 cows produces profits exceeding one-half million dollars.  This represents a substantial amount of profit that should have been captured in business records and explained by financial testimony.  The Racickys failed to produce evidence of their yearly revenues and expenses.  The Racickys offered no financial data or testimony establishing that 166 cows produce $500,000 in annual profit.

---

[10]The Herd Summaries do not show a drop from 23,000 pounds of milk per cow per year to zero and do not show the number of cows in the herd ever dropped below 159.  The Herd Summaries contain the following statistics on the Racickys' milk production:

| Date | Cows in Herd | Milk Prod./Rolling Yearly Herd Avg. | # Died | # Sold |
|---|---|---|---|---|
| 8/1/98 | 219 | 23,468 | – | – |
| 10/10/98 | 199 | 23,666 | 1 | 31 |
| 11/22/98 | 191 | 23,659 | 2 | 10 |
| 1/17/99 | 182 | 23,123 | 3 | 11 |
| 3/14/99 | 172 | 22,445 | 0 | 11 |
| 5/15/99 | 181 | 21,688 | 2 | 10 |
| 7/13/99 | 171 | 20,496 | 1 | 9 |
| 8/22/99 | 159 | 19,535 | 1 | 12 |
| 10/27/99 | 204 | 18,062 | 4 | 6 |
| 12/5/99 | 219 | 17,615 | 2 | 2 |

Farmland cites the Racickys' tax records which show either small profits or small losses on Schedule F, Form 1040, entitled "Profit or Loss From Farming." The Racickys did not call a witness to discuss the tax consequences of farming and whether Schedule F is an accurate indicator of whether the Racickys' operation was profitable.

What evidence regarding lost profits was presented? Robert Racicky testified their dairy's break even point was when the cows were producing 20,000 pounds of milk per cow per year on a rolling herd average and they were losing money when the herd average was 17,000 pounds of milk per cow per year. Robert also testified the break even point changed over the years. When Greg Racicky was asked whether he was making any money or breaking even when producing around 18,000 pounds of milk per cow per year, he said, "A lot of factors are involved in that. It depends on our feed cost, the price of milk. That is very borderline, you know. We would like to see 20,000 [pounds per cow per year] to be successful, you know, to make a living." This testimony, unsupported by expert testimony or financial data, demonstrates several material variables and does not support a lost profits award with any certainty.

Other evidence makes the lost profits determination even more speculative. The Racickys testified the cows in the herd lactated at different times. In addition, they acknowledged some cows died naturally, some were sold, others were bought, some became dry, and some would produce. This natural herd management and its impact on the profitability of the 166 injured cows was not explained at trial.

The financial data presented, though voluminous, was not accompanied by testimony explaining its significance. On appeal, the Racickys have not highlighted specific evidence supporting a lost profits award. If the Racickys cannot cite to specific evidence supporting the lost profits award, how could jurors reasonably understand what evidence supported a lost profits claim?

Because the Racickys provided insufficient evidence for a jury to determine lost profits with reasonable certainty, the district court should not have submitted this element of damages to the jury. Therefore, we must reverse the damages award.

## III.    CONCLUSION

We conclude sufficient evidence supports the jury's verdict on the issues of apparent agency, standard of care and proximate cause. We also agree with the parties that sufficient evidence supports a lost market value of $221,800. However, the record lacks sufficient evidence to support a lost profits award, and this element of damages should not have been submitted to the jury. The jury was not instructed on any other damages. "In cases where a jury awards actual damages in excess of the amount proved, remittitur to the maximum amount proved is an appropriate remedy." American Rd. Equip. Co., 29 F.3d at 345 (quoting Knickerbocker v. First Nat'l Bank, 827 F.2d 281, 289 n.6 (8th Cir. 1987)). We reverse the district court's judgment on damages and remand for a new trial on lost market value damages only, unless the Racickys, within thirty days after the issuance of our mandate, consent to a remittitur of the damage award to $199,620 ($221,800 less 10%).


A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.